*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *MRS. J. and MR. J., individually and* | ) | |
| *as parents and legal guardians* | ) | |
| *of I.J., a minor,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *No. 2:15-cv-00084-DBH* |
| | ) | |
| *PORTLAND PUBLIC SCHOOLS,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW*

Mr. and Mrs. J., parents of student I.J. ("Parents"), challenge the adequacy of the remedy awarded by a Maine Department of Education ("MDOE") hearing officer pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its state-law analogue, 20-A M.R.S.A. § 7001 *et seq.*, for a failure by defendant Portland Public Schools ("Portland") to provide I.J. with a free appropriate public education ("FAPE") during her fifth-grade year. *See* Plaintiffs' Memorandum of Law ("Parents' Brief") (ECF No. 29) at 1, 15-21. They also challenge the hearing officer's conclusions that Portland offered I.J. an appropriate seventh-grade placement at Lyman Moore Middle School ("LMMS") and did not impermissibly predetermine that placement. *See id.* at 1, 21-33.

For the denial of a FAPE to I.J. in fifth grade, the Parents seek the remedy of further educational instruction at Margaret Murphy Center for Children ("MMCC") or such other remedy as the court feels is appropriate. *See id*. at 21. With respect to the assertedly inappropriate seventh-

grade placement in public school, they ask that Portland be ordered to continue I.J.'s placement at MMCC. *See id*. at 33.

Portland asks that the court decline to disturb the hearing officer's award of specific compensatory educational services on account of the denial of a FAPE to I.J. in fifth grade and conclude, as did the hearing officer, that the offer of placement at LMMS in seventh grade was appropriate and not predetermined. *See* Defendant Portland Public Schools' Memorandum of Law ("Portland's Brief") (ECF No. 32) at 1, 35.

After careful review of the administrative record, I recommend that the court adopt the following findings of fact and conclusions of law, denying the requested relief on the bases that, (i) although the remedy ordered by the hearing officer for the fifth-grade denial of a FAPE to I.J. was inadequate, the Parents have not demonstrated a need for additional relief in view of I.J.'s continued placement at MMCC pursuant to the IDEA's "stay put" provision, and (ii) Portland offered I.J. an appropriate seventh-grade placement at LMMS that was not the product of predetermination.

## I.   Applicable Legal Standards

### A.   IDEA: Overview

1.     The IDEA is a "comprehensive statutory scheme" that Congress enacted to ensure that all children with disabilities are accorded a FAPE and that both their rights and those of their parents are protected.  20 U.S.C. § 1400(d)(1)(A)-(B); *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 58 (1st Cir. 2002).  A child with a disability is a child:

> (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

> (ii) who, by reason thereof, needs special education and related services.

*Mr. & Mrs. Doe v. Cape Elizabeth Sch. Dist.*, __ F.3d __, No. 15-1155, 2016 WL 4151377, at *1-*2 (1st Cir. Aug. 5, 2016) (quoting 20 U.S.C. § 1401(3)(A)).

2.      As a condition of receiving federal funds, states are required to provide a FAPE to all disabled children between the ages of three and 21.  *See, e.g., Ms. S. v. Regional Sch. Unit 72,* 829 F.3d 95, 113 (1st Cir. 2016); *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.,* 518 F.3d 18, 23 (1st Cir. 2008).   In order to provide a FAPE, a school must create and then follow an "individualized education program" ("IEP") for each disabled child.  *D.B. ex rel. Elizabeth B. v. Esposito,* 675 F.3d 26, 34 (1st Cir. 2012).  "To ensure that this takes place, a school district must take steps to identify children who may qualify as disabled, evaluate each such child to determine his or her eligibility for statutory benefits, and develop a customized IEP designed to ensure that the child receives a level of educational benefits commensurate with a FAPE."  *Ms. S.*, 829 F.3d at 113-14 (citation and internal quotation marks omitted).  "The IDEA also mandates that, to the maximum extent appropriate, a school district's special education accommodations should take place in the least restrictive environment available."  *Id.* at 114 (citation and internal punctuation omitted).

3.      "The IEP is the centerpiece of the IDEA's education delivery system for disabled children."  *Id.* (citation and internal punctuation omitted).  The IEP is "a written statement for each child with a disability that is developed, reviewed, and revised" in accordance with the IDEA and must include, among other things, the following: a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals; criteria for measuring progress toward those goals; and a statement of the specific services that the school will offer.  20 U.S.C. § 1414(d)(1)(A).  "A customized IEP must include, at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for

3

his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered." *Ms. S.*, 829 F.3d at 114 (citation and internal quotation marks omitted). "An IEP therefore must target <u>all</u> of a child's special needs, including a child's social limitations." *Id*. (citations and internal quotation marks omitted) (emphasis in original). "However, the IDEA does not promise perfect solutions, and the obligation to devise a custom-tailored IEP does not imply that a disabled child is entitled to the maximum educational benefit possible." *Id*. (citations and internal punctuation omitted). "We therefore review an IEP's compliance with the IDEA based on whether the IEP is reasonably calculated to confer a meaningful education benefit." *Id*. (citation and internal quotation marks omitted).

4.     The IDEA imposes additional procedural and substantive requirements with regard to the IEP. *See, e.g., Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987-88 (1st Cir. 1990). For example, parents have the right to be part of the IEP "team" along with the teachers and other educational professionals charged with formulating a child's particular IEP. 20 U.S.C. § 1414(d)(1)(B); *Lessard*, 518 F.3d at 23. The purpose behind such procedural safeguards is to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Pihl v. Massachusetts Dep't of Educ.*, 9 F.3d 184, 187 (1st Cir. 1993) (citation and internal quotation marks omitted). Thus, in the event of a dispute between the school and the child's parents regarding the IEP, the parents have the right to demand a hearing by an impartial hearing officer. *See, e.g.*, 20 U.S.C. § 1415(f)(1)(A), (B)(ii). A party dissatisfied with a hearing officer's decision may seek judicial review of that decision by a state court or a federal district court, which must (i) receive the records of the administrative proceedings; (ii) hear additional evidence at the request

of a party; and (iii) grant relief as it deems appropriate based upon the preponderance of the evidence. *See, e.g., id*. § 1415(i)(2)(A), (C).

5.     A court's authority to grant relief under the IDEA "includes the power to order school authorities to reimburse parents for their expenditures on private school education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Pihl,* 9 F.3d at 188 (citation and internal quotation marks omitted).

### B.  Standard and Scope of Review

6.     "Judicial review of administrative decisions in IDEA cases requires a more critical appraisal than clear-error review, but nevertheless falls well short of complete <u>de novo</u> review." *Cape Elizabeth*, 2016 WL 4151377, at *8 (citation and internal punctuation omitted).  "In the course of this involved oversight, a court must make bounded, independent decisions – bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Id*. (citations and internal quotation marks omitted).  "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court." *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (citations and internal quotation marks omitted).

7.     The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise.  *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.  More weight, however, is due to an

agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP provides the hope of educational benefit.").  Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole."  *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd* 471 U.S. 359 (1985).

8.     The First Circuit has "held that, in reviewing the hearing officer's determination in IDEA cases, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tell."  *Cape Elizabeth*, 2016 WL 4151377, at *10 (citations and internal quotation marks omitted).  "Hence, where . . . post-hearing evidence is credible so as to question the persuasiveness of the hearing officer's decision, a court should extend less deference to the hearing officer's determinations."  *Id.* (citation omitted).  "That is to say, the district court should afford more deference when its review is based entirely on the same evidence as that before the hearing officer than when the district court has before it additional evidence that was not considered by the officer."  *Id.* (citations and internal punctuation omitted).

9.     In IDEA cases, as in other contexts, the burden of persuasion rests on the party seeking relief.  *See, e.g., Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005); *Dobrowolski*, 976 F.2d at 54; *Maine Sch. Admin. Dist. No. 35 v. Mr. R.,* 176 F. Supp.2d 15, 23 (D. Me. 2001) (rec. dec., *aff'd* Feb, 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003), *called into doubt on other grounds*, *Boston Children's First v. City of Boston,* 395 F.3d 10, 15 (1st Cir. 2005)

6

("The party allegedly aggrieved must carry the burden of proving . . . that the hearing officer's award was contrary to law or without factual support.").

### C.  Adequacy and Appropriateness of IEP

10.     A parent may challenge a hearing officer's IDEA decision on either or both of two bases: that a particular school district did not comply with the procedures set forth in the act and/or that the IEP developed through the act's procedures was not reasonably calculated to enable a child to receive meaningful educational benefits.  *Board of Educ. v. Rowley,* 458 U.S. 176, 206-07 (1982).

11.     In *Burlington*, the First Circuit identified certain "basic guidelines" for determining the adequacy of an IEP, among these being the "achievement of effective results" and "demonstrable improvement in the educational and personal skills identified as special needs[.]" *Burlington*, 736 F.2d at 788.  The First Circuit subsequently clarified in *Roland M.* that, while "actual education results are relevant to determining the efficacy of educators' policy choices[,]" parties nevertheless should not "confuse what is *relevant* with what is *dispositive.*" *Roland M.*, 910 F.2d at 991 (emphasis in original). Although "[a]ctual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE . . . impos[ing] the inverse of this rule – that a lack of progress necessarily betokens an IEP's inadequacy – would contradict the fundamental concept that an IEP is a snapshot, not a retrospective." *Lessard,* 518 F.3d at 29 (citation and internal punctuation omitted).  "[T]he issue is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law." *Roland M.*, 910 F.2d at 992.

12.     In addition to developing an IEP that is reasonably calculated to provide meaningful educational benefits, *D.B.,* 675 F.3d at 34-35, a school district is required to implement the IEP in accordance with its requirements, *see, e.g., Doe ex rel. Doe v. Hampden-Wilbraham Reg'l Sch.*

*Dist.,* 715 F. Supp.2d 185, 195 (D. Mass. 2010) (*citing* 20 U.S.C. § 1401(9)(D)).  Although perfect implementation is not required, courts have found that "the failure to implement a material or significant portion of the IEP can amount to a denial of FAPE."  *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH,* 642 F.3d 478, 484 (4th Cir. 2011).  *See also, e.g., Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J,* 502 F.3d 811, 822 (9th Cir. 2007) ("a *material* failure to implement an IEP violates the IDEA") (emphasis in original).

### D.  Remedies

13.     Under the IDEA, the court has the power, "basing its decision on the preponderance of the evidence," to "grant such relief as [it] determines is appropriate."   20 U.S.C. § 1415(i)(2)(C)(iii).  Judges have broad discretion in fashioning an equitable remedy in IDEA cases.  *See, e.g., C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist*., 513 F.3d 279, 290 (1st Cir. 2008); *Pihl*, 9 F.3d at 188-89.  "[A]lthough an award of damages is not available, a court may award various forms of retroactive and prospective equitable relief, including reimbursement of tuition, compensatory education, and other declaratory and injunctive remedies."  *L.O. v. New York City Dep't of Educ.*, 822 F.3d 95, 125 (2d Cir. 2016) (citation and internal punctuation omitted).  Whereas tuition reimbursement is essentially a backward-looking form of relief, the remedy of compensatory education typically is prospective, "entitl[ing] [the] recipient to further services, in compensation for past deprivations [of the IDEA], even after his or her eligibility for special education services under [the] IDEA has expired[.]"  *Ms. M. ex rel. K.M. v. Portland Sch. Comm.,* 360 F.3d 267, 273-74 (1st Cir. 2004) (citation and internal punctuation omitted).

14.     In a case in which a child remains in public school under an inappropriate IEP, compensatory education may be granted if additional services are necessary to make up for the local educational agency's past failures.  *See, e.g*., *Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist.*

*No. 55,* 480 F.3d 1, 25 (1st Cir. 2007).  "[C]ompensatory education is not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA."  *C.G.,* 513 F.3d at 290.  A school district's responsibility for compensatory educational services does not depend on the vigilance of the parents.  *See, e.g., Mr. R.,* 321 F.3d at 20.  Nor does it depend on a finding that the school district acted in bad faith or egregiously.  *See, e.g., M.C. ex rel. J.C. v. Central Reg'l Sch. Dist.,* 81 F.3d 389, 397 (3d Cir. 1996).  Rather, "a student who fails to receive appropriate services during any time in which he is entitled to them may be awarded compensation in the form of additional services at a later time." *Pihl,* 9 F.3d at 187.

15.     "The nature and extent of compensatory education services which federal courts have recognized varies according to the facts and circumstances of a given case."  *Id*. at 188 n.8. "Such an award may include extra assistance in the form of tutoring, or summer school, while students are still within the age of entitlement for regular services under the Act, or an extended period of assistance beyond the statutory age of entitlement."   *Id*. (citations omitted). Compensatory education serves to replace the "educational services the child should have received in the first place" and "should aim to place the disabled children in the same position they would have occupied but for the school district's violations of IDEA[,]" *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005), although "there is no obligation to provide a day-for-day compensation for time missed[,]" *Park v. Anaheim Union High Sch. Dist*., 464 F.3d 1025, 1034 (9th Cir. 2006), *called into doubt on other grounds*, *V.S. ex rel. A.O. v. Los Gatos-Saratoga Joint Union High Sch. Dist*., 484 F.3d 1230, 1234-35 (9th Cir. 2007) (citation and internal punctuation omitted).

16.     In a case in which a disabled child's parents unilaterally place the child in a private school because the local educational agency failed to make a FAPE available to that child in a timely manner, tuition reimbursement may be granted if the alternative placement was "proper" under the IDEA.  *See* 20 U.S.C. §§ 1412(a)(10)(C)(ii) & 1415(i)(2)(C)(iii); *Rafferty v. Cranston Pub. Sch. Comm.,* 315 F.3d 21, 26 (1st Cir. 2002). "Reimbursement" is not damages, but rather payment of "expenses that [the school] should have paid all along and would have borne in the first instance had it developed a proper IEP." *Burlington*, 471 U.S. at 370-71.

17.     The question of whether a unilateral placement is "proper" is "viewed more favorably to the parent" than the question of whether the "placement was required in order to provide a free appropriate public education[.]" *Rome Sch. Comm. v. Mrs. B.,* 247 F.3d 29, 33 n.5 (1st Cir. 2001).  Under this analysis, a unilateral placement must be "appropriate," 20 U.S.C. § 1401(9)(C), *i.e.*, reasonably calculated to confer a meaningful educational benefit, *see Mr. I.,* 480 F.3d at 10, but need not be provided under public supervision or according to the terms of an IEP, *see* 20 U.S.C. § 1401(9)(A), (D); *Mr. I.,* 480 F.3d at 24 & n.22.  To be *reasonably* calculated to confer a meaningful educational benefit, the private placement "need provide only *some element* of special education services" in which the public school placement has been deficient, *Mr. I.*, 480 F.3d at 25 (citation and internal quotation marks omitted) (emphasis in original), and may not entirely disregard the concept of "[m]ainstreaming[,]" *Rafferty,* 315 F.3d at 26 (citation and internal quotation marks omitted).

18.     However, even if a unilateral placement is substantively "proper," a tuition reimbursement "may be reduced or denied" if the disabled child's parents failed to give the local educational agency proper notice that they would be pulling their child out of public school, if the agency properly notified the parents that it wished to reevaluate the child and the parents failed to

10

make their child available, or "upon a judicial finding of unreasonableness with respect to actions taken by the parents."  20 U.S.C. § 1412(a)(10)(C)(iii).

## II.  Proposed Findings of Fact

1.      I.J., one of a set of triplets born prematurely at 30 weeks' gestation, is a 15-year-old student with a complex disability profile and set of educational needs.  Complaint (Injunctive Relief Requested) ("Complaint") (ECF No. 1) ¶ 9; Answer (ECF No. 12) ¶ 9; Testimony of Mrs. J., Administrative Record ("Record"), Vol. XXI at 4846-71, Vol. XXII at 5017-24, 5042-63 ("*Mrs. J.*"), at 9.[1]  She has been diagnosed with Pervasive Developmental Disorder, Moderate Intellectual Disability, anxiety disorder, attention deficit disorder (combined type), hyperactivity disorder, gastroesophageal reflux disease, poor weight gain, juvenile rheumatoid arthritis, cerebral visual impairment ("CVI"), speech and language disorder, cerebral palsy, hypothyroidism, short stature, and nocturnal enuresis.  Complaint ¶ 10; Answer ¶ 10.

2.      I.J. has educational needs in a wide range of areas, including academics, behaviors, and communication.  Record, Vol. IV at 914, Vol. VII at 1495-96.  She requires a host of accommodations in her work setting to cut down on visual distractions.  Testimony of Barbara Ferguson, *id.*, Vol. XXI at 4932-53, Vol. XXII at 5015-16 ("*Ferguson*"), at 239-48.  Her primary behavioral concerns are active refusal, aggression, bolting, flopping, verbal protests, verbal perseveration, disrobing (categorized at two levels of intensity), and hyperarousal (defined as repetitive, non-purposeful movements that include rocking back and forth, bouncing in a chair, and slapping her arms, legs, or body).  Record, Vol. V at 1104.

3.      Barbara Ferguson, a teacher of the visually impaired who has worked with I.J. since preschool, testified that CVI is a "very complex" disorder that "impacts almost everything [I.J.]

---

[1] In setting forth witness's testimony, for ease of reference, I have cited the consecutively numbered pages of the hearing transcript rather than the Record pages where it is found.

does." *Ferguson* at 238.   CVI causes I.J. to be "very distracted by both visual and auditory stimuli[,]" requiring her to be taught new skills in "an individual setting with minimal distractions." Record, Vol. II at 461.  CVI is not an impairment in the functioning of the eyes but, rather, in the cerebral management of visual images and, thus, glasses cannot correct it. *Ferguson* at 237-38.

4.      I.J. attended Portland schools through fifth grade (2012-13), repeating kindergarten in 2007-08 by agreement of her IEP team because of her difficulties during her first year (2006-07).  Complaint ¶¶ 12, 15, 26-29; Answer ¶¶ 12, 15, 26-29.  Her kindergarten teachers reported that she required support to interact with peers and function in the classroom.  Record, Vol. II at 448.  However, they found her to be very sociable, with minutes of an IEP team meeting reflecting that "other children are a very powerful force for her."  *Id*. at 445.

5.       In 2007, psychologist Beverly Strzok, Ph.D., performed a cognitive evaluation of I.J. at age 6 in which she measured her full-scale IQ as 48, below the first percentile.  *Id*. at 450, 452.  Dr. Strzok recommended that I.J. receive considerable individual attention in a highly structured classroom.  *Id*. at 455.  The accuracy of these test results was later called into question due to limitations in testing children with I.J.'s combination of disabilities.  *Id*., Vol. VII at 1493.

6.      In 2008, two neurological consultants recommended that I.J. be taught using Applied Behavior Analysis ("ABA") techniques.  *Id*., Vol. III at 476, 499.  On February 20, 2008, David K. Urion, M.D., recommended that she "receive fairly intensive and aggressive services in school by a trained ABA instructor including but not limited to the utilization of ABA techniques." *Id*. at 476.  On May 29, 2008, Anne M. Neumeyer, M.D., stated that it was "essential" that she receive an ABA school program with a 1:1 student-teacher ratio for at least 20 hours a week.  *Id*. at 499.

7. The Parents requested that Portland provide ABA programming for I.J. and her twin sister; however, in the absence of consensus among members of her IEP team, Portland declined to do so, stating that it felt its existing structured programming for them had been successful. *Id.* at 492. The Parents disagreed, complaining to Portland staff that, after two years of kindergarten, their daughters had "very little, if any, pre-literacy and pre-numeracy skills." *Id.* at 603. They privately enrolled I.J. and her twin sister at MMCC, a special-purpose private school in Auburn, Maine, for an eight-week program in the summer of 2008, and were very pleased with their progress there. *Mrs. J.* at 29; Testimony of Allyson Feltis, Record, Vol. XXI at 4872-4901 ("*Feltis*"), at 116. I.J.'s teacher at MMCC reported, "[I.J.] learns quickly, is easily reinforced by social attention, and expresses herself incredibly well." Record, Vol. III at 614.

8. By letter dated August 12, 2008, Mrs. J. requested that Portland place I.J. and her twin sister at MMCC for first grade, stating that they had made "amazing progress" even in its part-time summer program and were "responding to the center's 1:1 ABA approach with an eagerness to learn that is exciting and is showing very positive results and promise for the girls." *Id.* at 606. Portland countered with an offer of ABA teaching methodologies to be delivered by a Board Certified Behavior Analyst ("BCBA") assisted by at least two educational technicians, and I.J. remained in Portland public schools, attending Riverton School for first through third grades. *Id.* at 607; *Mrs. J.* at 31-41.

9. For fourth grade (2011-12), Portland moved I.J. to the "BEACH" program, a day treatment program at Ocean Avenue Elementary School. *Mrs. J.* at 45-46. Theresa Moran, her teacher, used discrete-trial ABA programming. Testimony of Theresa Moran, Record, Vol. XXIII at 5173-99 ("*Moran*"), at 854. Moran was assisted by a team that included six educational technicians, whom she rotated among students so that each would become used to all of them, plus

a treatment team that included a Spring Harbor Hospital psychiatrist and a BCBA, Jonathan Kimball, Ph.D. *Id*. at 852, 855-56. Some days, I.J. had no behavioral issues while, other days, she did things like flop on the ground. *Id*. at 859.

10. The program included opportunities for mainstreaming in limited settings. *Id*. at 857-58. I.J., who was "a lot of fun," "funny," and "very social," made friends with a couple of mainstream peers "who really looked out for her and . . . were good peer models." *Id*.

11. Moran felt that I.J. did well in fourth grade, and Mrs. J. told the IEP team in March 2012 that she was pleased with the program, although she requested that the math curriculum be reviewed to address the limited progress that I.J. had made in that subject over the prior three or four years. *Id*. at 857; Record, Vol. IX at 1960. Mrs. J. testified that Moran was skilled and knowledgeable. *Mrs. J.* at 46. She described Moran as the first teacher who had been willing to collaborate with her and "a breath of fresh air." *Id*. at 46-47.

12. In March 2012, Portland conducted several evaluations of I.J., including an occupational therapy ("OT") assessment that concluded that she should begin a keyboarding program to further develop that skill and use it as her primary means of written communication. Record, Vol. IX at 2003. Ferguson also felt that keyboarding was a very important skill for I.J. because she does not have the visual or motor skills to write by hand. *Ferguson* at 251.

13. As early as I.J.'s fourth-grade year, Mrs. J. told Moran that she did not want I.J. to attend middle school at LMMS. *Mrs. J.* at 626. At hearing, Mrs. J. admitted that her mind had been made up "from the very beginning" that I.J. should not attend LMMS. *Id*.

14. I.J. continued in the BEACH program for fifth grade (2012-13) with Moran as her primary teacher. *Mrs. J.* at 50. Her IEP provided that she attend art and music with mainstream

peers.  Record, Vol. IX at 1954.  For lunch, she invited two mainstream peers to join her.  *Id.*; *Moran* at 868.

15.     On September 24, 2012, Moran emailed Mrs. J., notifying her that I.J. no longer had a 1:1 aide at recess and that one educational technician was covering both I.J. and a classmate, which Moran acknowledged was a violation of I.J.'s IEP.  Record, Vol. XII at 2764.  However, this problem lasted for only about a week.  *Moran* at 913.  During that time, there was an incident in which a child wandered off, and I.J. was left unattended for a few minutes while the educational technician went to find the other student.  *Id.* at 915-16.  In her September 24, 2012, email, Moran also informed Mrs. J. that I.J. was no longer in a lunch group on Monday, Wednesday, and Friday due to staffing changes and that there were times when I.J. would need to be grouped with other students for academics, although Moran knew this was "not ideal" and that I.J. had "a very hard time concentrating when no[t] by herself."  Record, Vol. XII at 2764.

16.     Mrs. J. brought concerns about these developments to the attention of Portland's Director of Special Education, Sharon Pray, who explained that the BEACH program had brought in a substitute to fill a vacant position.  *Id.* at 2762.  In a September 26, 2012, email to Moran, Mrs. J. also expressed concern that I.J. was putting her hands in her pants at school.  *Id.* at 2761.  In her response of the same date, Moran agreed that this needed to be addressed and that I.J. was increasingly exhibiting behaviors to get attention; for example, Moran had never seen I.J. "go as far as she did today" when she "totally trashed" Moran's room.  *Id.*

17.     In November 2012, Ferguson recommended a desktop computer for I.J., noting that it would have a much larger screen and provide better visual contrast than the Mac laptops used in Portland public schools.  *Id.*, Vol. IV at 722.  In a December 2012 report, she noted that there had been "concerns about [I.J.'s] ability to remain focused enough on her work to make significant

15

educational gains even though her resource room environment is designed to minimize distractions." *Id*. at 724.

18.     In response to a December 12, 2012, email in which Mrs. J. stated that she had kept I.J. home from school in part because she had heard Moran was not there and there was no substitute, Moran responded, "We very rarely get a sub." Record, Vol. XII at 2710.

19.     Portland kept data on I.J.'s behaviors, tracking hyperarousal, refusal, dropping, whining, and aggression. *Id*., Vol. IV at 725-30. Data kept between September 2012 and February 2013 showed that, compared with data from January 2012 through June 2012, I.J.'s hyperarousal levels had increased and were very high on a daily basis. *Id*. at 725-26.

20.     In February 2013, Ferguson conducted a keyboarding assessment for I.J., stating, "Compared with her previous typing on a full size keyboard of a computer, [I.J.] appeared to scan the keys somewhat faster on the Mac laptop and iPad." *Id*., Vol. IX at 1896. The keyboard in I.J.'s classroom broke in November 2012 and was not repaired or replaced until the spring of 2013. *Mrs. J*. at 82-83.

21.     In a March 13, 2013, email to Moran, Mrs. J. inquired about I.J.'s progress in reading and whether the Rigby reading test was still being given. Record, Vol. XII at 2662. Moran replied that she had tested I.J. a couple of months earlier and that she was still reading at the same level (kindergarten). *Id*.

22.     I.J.'s IEP team convened on March 28, 2013, for her annual review. *Id.*, Vol. VIII at 1871. Mrs. J. presented a statement of numerous parental concerns. *Id*. at 1875-77. The Parents' primary concern was that I.J. had "failed to reach math and reading goals that should have been mastered in 2010." *Id*. at 1875. They also listed, among 34 concerns, that I.J.'s math program was not appropriate for her, she had regressed in some math skills such as telling time and coin

values, she was being given math instruction in a group setting, she was still reading at a kindergarten level and had actually regressed, and reading consultant Lori Coffin was no longer consulting. *Id*. They also expressed concern about I.J.'s behaviors, including work refusal and putting her hands down her pants, the lack of a keyboard, given the illegibility of I.J.'s handwriting, Portland's failure to provide an assistive technology evaluation that had been approved at two prior IEP team meetings in 2012 and 2013, as a result of which Mrs. J. had just signed a contract with ALLTECH to perform that evaluation, and Portland's failure to replace I.J.'s O&M, or orientation and mobility, specialist after the specialist moved, as a result of which I.J. had not received the O&M services called for in her IEP. *Id*. at 1875-76.

23. Moran presented an annual IEP progress report, stating that I.J. had mastered only eight new words on the Dolch Primer *versus* 37 the prior year, that it took her seven months to learn four new words, that she had difficulty with passage reading, and that her typing was inconsistent due to computer issues in the classroom, although a new computer had been ordered. *Id*. at 1846. Moran reported that I.J. had made some progress on her math goals, and when she did not make progress on her plus-2s, her program was revamped. *Id*. at 1846-47. She had made progress in counting and number sequencing, but had made no progress in her new coin identification program, days of the week, or calendar skills. *Id*. at 1847-48. Moran's behavioral data showed an improvement in I.J.'s behaviors of refusal, dropping, and aggression. *Id*. at 1849.

24. The IEP team agreed that Portland would obtain an assistive technology evaluation, with recommendations for programming, from ALLTECH, approved changes to I.J.'s OT, physical therapy ("PT"), and speech-language pathology ("SLP") programs, and agreed to continue her annual review on April 4, 2013. *Id*. at 1866-67.

25.     At the April 4 meeting, Mrs. J. expressed concern about the amount of time I.J. was losing because of her behaviors, stating that she felt that I.J. would do better if only two educational technicians worked with her.  *Id*. at 1851.  Dr. Kimball stated that he believed I.J.'s behavior plan, which involved the use of stars, tokens, and small rewards to reinforce desirable behavior and a "three strikes card" to deter undesirable behavior, was appropriate.  *Id*. at 1851, 1854-56; *Moran* at 863-64.  However, he recommended an experiment to test the hypothesis that her behaviors would improve if she were in a setting with fewer distractions, aided by only two technicians. Record, Vol. VIII at 1851.  The IEP team agreed that Dr. Kimball should design the experiment and provided for 30 minutes of BCBA consultation every week and an additional 60 minutes every other week.  *Id*. at 1850.  The meeting was adjourned until April 10, 2013, for purposes of finalizing I.J.'s IEP.  *Id*.

26.     At its April 10 meeting, the IEP team agreed to have Coffin complete speech/language and reading achievement evaluations of I.J.  *Id*. at 1813.  The team also agreed to have a Portland math consultant assess I.J.'s academic achievement in math and to have I.J. complete an ABLLS, or Assessment of Basic Language and Learning Skills, test.  *Id*.; *Moran* at 889.  The ABLLS test is designed for children with autism and has sections on academics, socializing, play, dressing, toileting, PT, and OT.  *Moran* at 889.  The team also agreed that, as part of Dr. Kimball's experiment, the same two educational technicians would provide services to I.J. Record, Vol. XIII at 1813.  Mrs. J. requested that I.J. be placed at MMCC for Extended School Year ("ESY") services that summer, and the team agreed to consider doing so after receiving testing results.  *Id*. at 1813-14.

27.     In a letter to the IEP team dated May 8, 2013, the Parents stated that, although Moran tried to help I.J. make progress by changing programs throughout the year when she had

18

not seen results, I.J. had difficulty meeting many of her IEP goals.  *Id.*, Vol. IV at 746.  They noted that her Rigby reading level was the same as it had been in 2010, she had mastered only eight new Dolch Primer words during the school year, her Personalized Alternative Assessment Portfolio ("PAAP") scores in reading had been flat for two years, and her PAAP math scores had gone down.  *Id.*  They wrote:

> [I]t is extremely troubling to know that during these vital foundational years of education, [I.J.] has not met yearly goals for 3 years now.  We are not willing to continue with the same programming until we understand better what works for her and make those adjustments in her programming.  We believe the most expedient and cost effective way to do this is to immerse her in the Margaret Murphy program again this summer.  They would develop and monitor her program and make specific recommendations going forward into next year.

*Id.* at 747.

28.     Moran was able to complete only the math and reading components of the ABLLS test because the behavior experiment was taking a great deal of time.  *Moran* at 890.  She testified that the testing showed that I.J. was "making gains[,]"although they were not "huge[.]"  *Id.*

29.     In an evaluation dated June 3, 2013, Coffin noted that it had been difficult to assess I.J.'s literacy skills given her issues with attention, vision, and behaviors.  Record, Vol. VIII at 1792, 1798.  She stated that, although I.J.'s standardized testing scores in literacy were extremely low, her actual ability to read and understand a passage at her grade level did not appear as low.  *Id.*  She noted, "It is expected that her progress will be slow and laborious . . . given extraneous factors."  *Id.* at 1799.  She explained that one could not expect to see I.J.'s grade-level standardized scores increase dramatically or quickly but that data could show eventual improvement over time.  *Id.*  She recommended, among other things, the use of the Edmark reading program, which Portland had used in the past for her.  *Id.*  Coffin noted that she had observed I.J. at recess and found it "concerning" that she was constantly pulling her pants up to her chest, pulling up her shirt and exposing her stomach and chest, and touching her privates.  *Id.* at 1795.

19

30.     The IEP team reconvened on June 4, 2013.  *Id*. at 1789.  Coffin reviewed the results of her evaluation, Moran reported that ABLLS testing in reading and math revealed that I.J. had made some progress in both since she had last taken that test in 2009, and Barbara Dunham reviewed the results of a math evaluation, stating that I.J.'s overall standard scores of 55 in all three of the overall content areas were well below average range when compared with her same-age peers, although she knew some basic mathematical skills.  *Id*. at 1790.  Dr. Kimball stated that his behavioral experiment did not demonstrate that I.J. did better in a small room with no one else and that there was no compelling reason to use an isolated space for her.  *Id*.  Moran stated that, due to I.J.'s behaviors and attention problems, MMCC would be an appropriate summer placement for her.  *Id*.

31.     The IEP team agreed to place I.J. at MMCC for the summer, made modifications to her math and reading programs, agreed to administer ABLLS testing of I.J. each trimester, and agreed to arrange for Terese Pawletko, Ph.D., a psychologist with expertise working with children on the autism spectrum who are blind or visually impaired, to perform psychological, intellectual, and possibly academic evaluations of I.J.  *Id*. at 1789-90; Testimony of Terese Pawletko, Ph.D., Record, Vol. XXII, at 5092-5117 ("*Pawletko*"), at 644-45.  The team further agreed to arrange a transition meeting with MMCC in August to discuss I.J.'s sixth-grade year and to send an educational technician to shadow her at MMCC before the school year started, if possible.  Record, Vol. VIII at 1790.  Seth Vincent, who served as I.J.'s BCBA at MMCC, understood at the time that I.J. was placed at MMCC just for the summer and was to return to Portland schools that fall.  Testimony of Seth M. Vincent, Record, Vol. XXI at 4954-60, Vol. XXII at 4961-83 ("*Vincent*"), at 326-27, 381.

32.     I.J.'s summer program at MMCC went very well.  *Mrs. J.* at 110.  She attended school in MMCC's Rodman Center building, approved by the State of Maine for students in grades kindergarten through six, for three hours a day, four days a week.  *Feltis* at 188; Testimony of Sharon G. Pray, Record, Vol. XXIII at 5214-28, 5260-77 ("*Pray*"), at 1015-16.  She loved going there.  *Mrs. J.* at 111.  She made progress in reading, beginning the Edmark program at lesson 40 and ending it at lesson 81, and made good progress in six of eight areas in math, regressing in the other two.  Record, Vol. IV at 774-75.  She also made progress on behavior goals, although her active refusals increased.  *Id*. at 776-78.  MMCC implemented a behavior support plan to decrease I.J.'s interfering behaviors.  *Id.* at 789-94.  At the end of the summer, I.J.'s endocrinologist, who had been concerned enough about her lagging growth rate to consider growth hormone injections, was "astounded with her growth[,]" which had gone "from going down to virtually . . . spiking up."  *Mrs. J.* at 111-12.  He penned a letter dated August 30, 2013, advocating for I.J.'s continued enrollment at MMCC.  Record, Vol. VIII at 1680.

33.     The IEP team reconvened on August 26, 2013, with MMCC staff in attendance to share information about I.J.'s summer and review her program.  *Id*. at 1682-83.  At that time, Portland was hiring a new teacher to run the functional life skills ("FLS") program at LMMS.  *Pray* at 1019-20.  The new teacher, Sarah Bruno, had to provide her former employer 60 days' notice of her departure and, therefore, was not available to work at LMMS until after the start of the school year.  *Id*. at 1021.

34.     In advance of the August meeting, the Parents shared a list of concerns about I.J.'s continuation in the Portland schools, including that she had not received ABLLS testing by the end of her fifth-grade school year as agreed at the April 10, 2013, IEP team meeting and had not yet received an assistive technology evaluation.  Record, Vol. VIII at 1689.  They added that

teachers were still being interviewed for LMMS's special education classrooms and had not been involved in I.J.'s transition, no one from Portland had visited MMCC to shadow over the summer, there was no plan to transition I.J. to LMMS, and LMMS was, in their view, a "highly inappropriate" placement in that I.J., a very social child, would be placed in an FLS classroom with nonverbal children.  *Id.*

35.    Although Moran could not attend the August meeting, she shared her opinion that I.J. should remain at MMCC until Bruno had a chance to set up her room and get up to speed, allowing Portland time to plan I.J.'s transition to LMMS.  *Id.* at 1684; *Moran* at 897-98, 910-11. Moran felt that it was important, for purposes of a smooth transition, to have a period of observation, shadowing, and assistance from MMCC staff.  *Id.*  The IEP team agreed to keep I.J. at MMCC, "review progress after a 5-6 week period and reconvene the IEP team to discuss next steps."  Record, Vol. VIII at 1684.  Mrs. J. understood this to mean that the IEP team would determine whether MMCC was a more appropriate placement for I.J.  *Mrs. J.* at 469-70.  Pray understood it to mean that the IEP team would transition I.J. to LMMS.  *Pray* at 1022.

36.    I.J. began her sixth-grade year (2013-14) at MMCC in September 2013.  *Feltis* at 118.  She shared a 1:1 classroom with another female student who was a year younger and was verbal, and ate breakfast often with two or three peers and their educational technicians in the FLS kitchen.  *Id.* at 123-24.  Two of these students were verbal, and one was nonverbal.  *Id.* at 124. Allyson Feltis became her case manager, overseeing individual instruction provided to her by two educational technicians, one in the morning and one in the afternoon.  *Id.* at 118, 121-22, 214. Educational technicians at MMCC undergo a number of training programs, including behavioral health professionals training, and safety care training regarding physical intervention.  *Id.* at 122-

23.  Feltis felt that I.J. would have difficulty getting things done in a big classroom with more than one other child.  *Id*. at 139-40.

37.     The IEP team reconvened on October 2, 2013, with a stated purpose of reviewing IEP goals proposed by MMCC staff and discussing placement/transition to LMMS.  Record, Vol. VIII at 1650.  MMCC staff reported that I.J. was reading at the end of first grade level (C level) and continued to use the Edmark program.  *Id*. at 1650, 1655.  Bruno stated that she also used Edmark in the FLS program at LMMS.  *Id*. at 1650.  MMCC used the Math in Focus program, which Bruno agreed to use at LMMS.  *Id*.  I.J. was in the first-grade level in math and at the end of kindergarten level on Dolch list words.  *Id*.  Bruno stated that she was confident that the goals proposed by MMCC staff were reasonable and could easily be put in place at LMMS.  *Id*.  MMCC staff stated that a major concern was I.J.'s increase in disrobing, noting that I.J. had been disrobing, flopping on the floor, and sometimes trying to bolt, requiring the intervention of a number of people.  *Id*. at 1651.  They recommended the performance of a functional behavioral assessment ("FBA") to analyze the function of the behaviors.  *Id*.

38.     The IEP team agreed that MMCC would conduct the FBA, completing it by November 26 or, at the least, providing a summary on that date, and Dr. Pawletko would also complete her evaluation by that date.  *Id*. at 1649-50.  The IEP team also agreed to involve psychologist Bruce Chemelski, Ph.D., in I.J.'s case through observations, record review, and contact with the Parents.  *Id*. at 1649.  Dr. Chemelski, the senior psychologist for Spring Harbor Hospital's Developmental Disorders Unit and the clinical director of Spring Harbor Academy, a school run as part of that unit, is a specialist in behavioral programming, transitioning children from more restrictive to less restrictive settings, and building a hospital-based model of clinical teaming, a model that he had imported to Portland public schools through his consulting work.

Testimony of Bruce E. Chemelski, Ph.D., Record, Vol. XXII at 5117-41 ("*Chemelski*"), at 749-50, 752-54, 756-61, 763.  Mrs. J. inquired as to the team's determination regarding assistive technology/keyboarding for I.J.; Pray indicated that she would ask Dr. Pawletko to include that subject in her evaluation.  Record, Vol. VIII at 1651.

39.     Mrs. J. and her advocate requested that I.J. be kept at MMCC for the remainder of the school year and not be transitioned to LMMS until her summer ESY program, arguing that MMCC had a BCBA on staff, I.J. was making academic progress there, and the environment at LMMS was not appropriate for her at that time.  *Id.*  Mrs. J. shared a letter from Carol Hubbard, M.D., I.J.'s primary care physician, recommending that I.J. be kept at MMCC, and a letter from I.J.'s endocrinologist containing data showing that her growth and anxiety had improved since enrolling at MMCC.  *Id.* at 1652; *see also id.* at 1673-75.

40.     Pray stated that, while she understood Mrs. J.'s reluctance to transition I.J., the "plan from the start was to transition [her] back to LMMS in the fall[,]" with a delay until Bruno settled into her classroom and had the opportunity to get to know I.J. and her educational needs.  *Id.* at 1651.  She observed that Dr. Hubbard had not had the opportunity to talk with staff, visit LMMS, or talk with her (Pray) about what was available at LMMS.  *Id.* at 1652.  LMMS Principal Steve Rogers stated that he believed Portland could meet I.J.'s needs, that it was Portland's responsibility to teach her strategies to be a successful part of the school community, and that I.J. needed the opportunity to socialize with typical peers who lived and went to school in her own neighborhood.  *Id.* at 1651; *Pray* at 1023.

41.     Pray presented three alternate proposals for I.J.'s transition, all of which were to begin during the week of October 14, two of which culminated in her full-time attendance as of the week of November 4, and one of which culminated in her full-time attendance as of the week

of October 28.  Record, Vol. VIII at 1652.  Pray described the proposals as consistent with the IEP

team's June 4 determination to send I.J. to MMCC for the summer only and its August 26

determination to extend her stay at MMCC until Bruno was in place and familiar with I.J.'s needs.

*Id*.  She added that Portland could implement MMCC's proposed IEP and behavior plan in the

least restrictive environment.  *Id*.

42.     The IEP team was unable to reach consensus, with MMCC staff taking the position

that none of the three options presented by Pray would work, Portland staff suggesting postponing

the transition date by a month to allow time to consider the results of the Pawletko evaluation and

the FBA, and Mrs. J. and her advocate continuing to request that I.J. remain at MMCC.  *Id*. at

1653.  In the absence of consensus, Pray "made the determination to extend the [transition] date

to December 2nd, 2013[,]" on which date I.J. "will be attending LMMS full time[,]" stating that

the IEP team would reconvene on or before November 26 to review evaluation results and the

transition to LMMS.  *Id.*  The team rejected the option of keeping I.J. at MMCC for the balance of

the school year "because LMMS ha[d] the ability to implement the proposed goals/objectives in a

less restrictive environment."  *Id*.  Mrs. J. strongly objected to the planned transition and expressed

frustration about the emphasis to transitioning I.J. to LMMS rather than discussing the appropriate

placement for her.  *Mrs. J.* at 456-70.

43.     At the due process hearing, Pray testified that it is her practice to set deadlines to

move people to meet goals, but that she is willing to be flexible, which she stated was illustrated

by her conduct in this case.  *Pray* at 1028-29, 1087-88.  However, she did not make clear at the

time she set the December 2 deadline that it was merely a target that was subject to change, and

Mrs. J. felt "bullied into this position to have to set a date."  *Mrs. J*. at 559-61.  Pray acknowledged

at hearing that, as of both October and November 2013, having I.J. in the FLS room at LMMS was not appropriate. *Pray* at 1086-87.

44.     In an email to Pray dated October 8, 2013, Mrs. J. stated that the Parents "expect[ed] that no final decisions about changes to [I.J.'s] program or placement [would be] made before the team [was] able to consider" the information in Dr. Pawletko's evaluation.  Record, Vol. IV at 820.  On October 18, 2013, in response to an email from Megan Bailey of MMCC requesting copies of Portland's records concerning I.J., Pray stated, "She will be leaving in November, so I don't think we need to make copies of all these documents and mail them."  *Id.* at 823.

45.     On October 21, 2013, Ferguson completed a report assessing the appropriateness of the FLS classroom at LMMS for I.J.  *Id.* at 825.  She deemed it inappropriate, stating that the room was "visually busy with questionable acoustics."  *Id.* (internal quotation marks omitted).  She noted that I.J. would have the option of moving across the hall to another room but described it as "another large room with just a small corner of the room available for individual work."  *Id.*  She noted that "[t]ransitional times are difficult for [I.J.]" and that "[i]t would be challenging to keep a work space in another room set up for her so that all her teaching materials were conveniently available and the room offered minimal visual and auditory distractions throughout the school day."  *Id.*

46.     In October and early November 2013, Dr. Pawletko conducted her psychological examination of I.J.  *Id.*, Vol. VII at 1492.  She stated that, while she had the impression that I.J. had cognitive limitations, it was difficult to assess their extent.  *Id.* at 1493.  She noted that many of the measures used to evaluate I.J. in the past should be viewed with considerable caution because they failed to take into account the impact of her CVI, her highly anxious responses to changes in her environment, and her significant dyspraxia.  *Id.*  She summarized:

> [I.J.] is an endearing, socially interested, and motivated preadolescent with an
> extremely complex set of diagnoses including: cerebral vision impairment,
> dyspraxia, intellectual disability, autism spectrum disorders, sensory sensitivities,
> deficits in executive functioning (e.g., directing attention, sustaining attention,
> shifting attention), and juvenile rheumatoid arthritis.  In addition, she demonstrates
> significant difficulties in the area of emotional and physical regulation (e.g.,
> anxiety, arousal level).  They impact in ways that are multiplicative, rather than
> simply additive, and will require a team and setting that can balance and integrate
> and respond to her learning challenges in a coordinated and responsive way.

*Id*. at 1511.

47.     On November 13, 2013, Dr. Hubbard observed the FLS classroom at LMMS and

spoke with Bruno, who gave her a tour and discussed the daily routine and how the staff addressed

students' needs.  *Id*., Vol. IV at 833.  Dr. Hubbard identified positive features of the classroom as

its mix of community/classroom activities, its fairly large physical space, with kitchen and other

facilities, its proximity to PT and OT rooms, its opportunities to reverse-mainstream, and the

presence of one female peer for an hour or more per day who was quite social and interactive.  *Id*.

at 834.  However, she had concerns that some students were physically aggressive and not as verbal

or interactive as I.J., students and staff were mostly male, presenting issues with I.J.'s tendency to

disrobe, and that providers working with I.J. due to her CVI, which was not Dr. Hubbard's area of

expertise, felt the large space would be problematic for her.  *Id*.  She also expressed concern that

behavioral data was not as regularly collected there as at some other programs.  *Id*.

48.     On November 14, 2013, Portland received the assistive technology report from

ALLTECH that had been requested in March 2013; however, it contained limited information.  *Id*.,

Vol. VII at 1488-89; *id*., Vol. XIII at 1866, *Mrs. J*. at 556.

49.     The IEP team reconvened on November 15, 2013.  Record, Vol. VII at 1479.  Dr.

Pawletko reviewed the results of her evaluation, stating that I.J. required "consistency in staffing,

[a] controlled environment, [and] reduced sound levels and activity."  *Id*. at 1480.  She described

I.J. as having "A," "B," and "C" types of days for which staff should plan in advance.  *Id*.  MMCC

reported that the FBA was not yet completed and updated the team on its progress thus far. *Id*. at 1480-81. Mrs. J. inquired about the status of ABLLS testing; MMCC staff stated that, although ABLLS was a good tool, other assessments might be better suited to I.J. *Id*. at 1481. Mrs. J. asked who would perform the testing, and Pray responded that Portland would because I.J. would be returning to LMMS on December 2. *Id*. This led to an outburst from Mrs. J., who stated that she felt she was being bullied, and an end to the meeting. *Id*. at 1479, 1481.

50.   On November 19, 2013, the Parents filed a due process hearing request, invoking I.J.'s "stay put" rights, which required her continued placement at MMCC during the pendency of the due process proceeding. *Id*. at 1463, 1469. The parties reached an agreement during mediation in mid-December 2013 that I.J. would remain at MMCC and that, upon receipt of the MMCC FBA, which was to be accomplished no later than January 2014, Portland would schedule an IEP team meeting "to review the FBA and to make any programming or placement decisions that the Team sees as necessary for the delivery of a free appropriate public education for [I.J.] in the least restrictive environment." *Id*. at 1429-30. The FBA was actually completed on December 9, 2013, although Portland did not receive a copy until after the mediation agreement was reached. *Id*. at 1431; *Pray* at 1032.

51.   In a December 20, 2013, email to Mrs. J. regarding the scheduling of the initial IEP team meeting, Pray stated that, at the meeting following the initial one, "we can discuss the transition plans from MMCC to LMMS. How does that sound to you?" Record, Vol. XI at 2495. This exasperated Mrs. J., who felt that, even in the face of the parties' agreement to consider I.J.'s placement, Pray remained determined to transition I.J. to LMMS. *Mrs. J.* at 568. Pray emailed members of the IEP team on January 7, 2014, that the agenda for their upcoming IEP team meeting would include review of the FBA and "beginning dialogue around transition to LMMS[.]" Record,

Vol. IV at 850-51.  At the first post-agreement IEP team meeting on January 9, 2014, Mrs. J. raised her concern about the focus on transition.  Record, Vol. VII at 1422.  After stepping out of the room to speak with Mrs. J.'s attorney, Pray agreed that the team would only consider the FBA at the January 9 meeting and discuss placement at the following one, revising her meeting notice accordingly.  *Id.*

52.     Ferguson observed I.J. at MMCC on January 15, 2014.  *Id.*, Vol. IV at 869.  I.J. received instruction in a small room with a beanbag chair, a rug, and a desk facing the wall. *Ferguson* at 268.  Ferguson felt that the size of the room was appropriate, especially for acoustics, and noted that there was a white noise machine.  *Id.* at 269.  She thought the room was kid-friendly and had appropriate lighting, and she did not notice hallway noise.  *Id.* at 270.  During a short walk to the supply room, she observed that I.J. was easily distracted and needed to be reminded to stay on task but was cooperative.  Record, Vol. IV at 870.  She thought that I.J. would benefit from using a slant board and a reading stand and recommended that any word cards be made with black markers and not laminated, to avoid glare.  *Id.*   She recommended that I.J. have an assistive technology assessment because her visual/motor issues affected her ability to type.  *Id.*

53.     The IEP team met again on February 26, 2014, March 19, 2014, and April 30, 2014. *Id.*, Vol. V at 1127, Vol. VI at 1231, 1304.  The February 26 and March 19 meetings, as well as a portion of the April 30 meeting, were devoted to finalizing I.J.'s IEP, which provides for specially designed instruction, OT, PT, vision services, O&M consultation, behavioral psychological services, and visual psychological services.  *Id.*, Vol. V at 1127-28, Vol. VI at 1231-32, 1304-05. The team agreed, *inter alia*, to provide I.J. with 40 hours per quarter of BCBA services, consistent with Vincent's recommendation.  *Id.*, Vol. VI at 1232; *Vincent* at 352.  At its March 19 meeting, the team discussed I.J.'s placement but agreed to defer a placement decision until developing a

draft transition plan to review.  Record, Vol. VI at 1232.  Mrs. J. asked that I.J. not be moved from MMCC for at least one more school year.  *Id.*

54.     To serve I.J. should she return, Portland created an interdisciplinary team that included Drs. Chemelski and Pawletko, Ferguson, and I.J.'s lead teachers, educational technicians, occupational therapist, physical therapist, and speech therapist.  *Chemelski* at 763-64, 768-69.  The team also included Mark Hammond, a communications expert whom Portland agreed in March 2014 to commission to conduct a more thorough technology assessment than that obtained from ALLTECH in November 2013.  *Id.* at 764; Record, Vol. VI at 1232.

55.     Dr. Chemelski had previously worked with Bruno and was "very impressed with her skill set" and thought that Dr. Pawletko, who had "consulted across the world, including in Ireland," was "of great value to any team" with a child with a visual impairment.  *Chemelski* at 769, 771.  Dr. Chemelski described the team as operating on "a hospital-based model, . . . to try not to function as a reactive team but to function proactively and to function as an interdisciplinary team[.]"  *Id.* at 763.  Dr. Pawletko stated that the team of experts put in place for I.J. at LMMS was "a critical component for her, because of the need to collaborate and share information and develop activities taking into account the multiplicity of things going on."  *Pawletko* at 680.

56.     Drs. Chemelski and Pawletko developed a draft transition plan for I.J. dated March 31, 2014, sought input from Mrs. J. and MMCC, and integrated some of their suggestions. *Pawletko* at 682; Record, Vol. V at 1134-36.  The IEP team met on April 30, 2014, to review the plan as revised, determining, over the objections of Mrs. J. and MMCC staff, that I.J. could satisfactorily transition to LMMS pursuant to that plan by the first day of the 2014-15 school year. Record, Vol. V at 1127; *Vincent* at 370-71.  MMCC had developed its own guidelines for transition readiness, pursuant to which I.J. was not ready to transition to LMMS at any time through the date

of the hearing.  *Id*. at 372.  Vincent expressed concern that transitioning her to LMMS could cause her interfering behaviors to skyrocket.  *Id*. at 374.

57.    The team considered whether I.J. should remain at MMCC for the 2014-15 school year but determined that she should not because LMMS offered a less restrictive environment in which her IEP could be implemented.  Record, Vol. V at 1128.  Mrs. J. continued to believe that LMMS was not an appropriate placement.  *Mrs. J.* at 637.  She felt that MMCC, with its much smaller scale, was a comfortable and effective placement in which I.J. could progress.  *Id*. at 596.  She had lost faith in Portland's ability to educate her daughter.  *Id*. at 568-70.  Nonetheless, while not necessarily agreeing with the proposed transition plan, she asked to see a "calendar of events" for the proposed transition.  Record, Vol. V at 1128.  Pray provided Portland's proposed transition timeline to Mrs. J. on June 3, 2014.  *Id*. at 1004.

58.    The transition plan, as revised effective May 7, 2014, called for LMMS to provide enumerated equipment and curriculum materials, physical space, staffing, and assessments by certain dates.  *Id*. at 1121-22.  The equipment included a white noise machine, a rug, and a bean bag chair, as well as consideration of whether I.J.'s room needed a partition to define a workspace and exercise/break place.  *Id*. at 1121.  With respect to programming, the plan provided that, initially, I.J.'s schedule would mirror that at MMCC and she would eat her snack and lunch in her classroom, or the FLS classroom at a time when there was less stimulation.  *Id*. at 1122.  The plan envisioned that, as I.J. settled into her new routines and placement, she would have access to appropriately matched instructional peers and peer groups and eat in the OT room with "a small lunch bunch[.]"  *Id*. at 1122.  The stated goal was "to gradually expand her social and activity circles while maintaining her regulation and safety."  *Id*.

59.     On June 5, 2014, Mrs. J. emailed Pray to request a "transition IEP" before June 20. *Id.* at 1005. Pray responded that Portland had not intended to have a team meeting but that she could try to pull together a transition staffing. *Id.* On June 12, 2014, Mrs. J. emailed Pray to request "an IEP with the core transition team . . . unless you feel the entire team needs to attend." *Id.* at 1010. She noted that she had reviewed the plan with staff at MMCC and that there were things she wanted to discuss to assure a smooth transition. *Id.* She followed up on June 17, 2014, with an email detailing concerns about the transition plan and requesting "an IEP[.]" *Id.* at 1012-16. Pray emailed Mrs. J. on June 19, 2014, stating that she had to check on participants' schedules. *Id.* at 1017. When the Parents heard nothing further from Pray, they filed a due process request on July 11, 2014. *Mrs. J.* at 586-87.

60.     In accordance with updated transition plan timelines, on June 18, 2014, Ferguson observed the area that LMMS proposed to use for I.J. *Id.* at 1018-19. She noted that all of the rooms were in close proximity to one another so that I.J. would not be subjected to multiple distractions of walking through long hallways. *Id.* at 1018. She thought that I.J.'s proposed individual classroom resembled a "utility room" because there was a lot of equipment in it. *Ferguson* at 281-82. She noted that the classroom was at least twice the size of I.J.'s classroom at MMCC but could be divided. Record, Vol. V at 1018. As at MMCC, there were no outside windows. *Id.* She recommended that fluorescent lights be replaced by full spectrum lights in the classroom but noted that this was not difficult to do. *Id.* She recommended that, as at MMCC, I.J.'s desk be positioned against the back wall in a corner of the room and a rug be placed on the floor. *Id.* at 1018-19. She expressed concern that there were windows in the FLS room and the OT, PT, and SLP areas that would interfere with I.J.'s ability to stay focused on her work. *Id.* at 1019. She testified that the noise of students passing through the hallway near I.J.'s classroom

could be distracting to her, but noted that there were no students passing through it during the short time she visited.  *Ferguson* at 283-84.

61.     The transition plan called for Portland staff to observe I.J. at MMCC and meet with MMCC staff by July 11, 2014.  *Id*. at 1119.  The parties stipulated that Dr. Elizabeth Cameron, MMCC's psychologist, would have testified that no Portland staff visited MMCC between April 30, 2014, and August 15, 2014.  *Id*., Vol. XXIII at 5279-80; *see also id*., Vol. XXII at 5024.

62.     On July 21, 2014, Pray notified the IEP team that Portland had hired Sandra Titcomb to be I.J.'s teacher and case manager.  Record, Vol. XI at 2397.  Pray incorrectly stated that Titcomb was also a BCBA, although Titcomb had not yet taken her BCBA examination.  *Pray* at 1115-19.  However, Titcomb corrected the error, and at hearing Pray acknowledged and apologized for her mistake in so reporting.  *Id*.  At hearing, Pray testified that Portland had hired Devon Mulcunry to be I.J.'s BCBA.  *Id*. at 1117-18.  She stated that she had hired Mulcunry prior to hiring Titcomb but then acknowledged this was incorrect.  *Id*. at 1042-43, 1123.  She did not mention Mulcunry in any emails sent prior to the hearing.  *Id*. at 1117.

63.     Titcomb has a bachelor of science degree in special education and a master's degree in counseling and is a certified special education teacher.  Testimony of Sandra M. Titcomb, Record, Vol. XXIII at 5199-5214 ("*Titcomb*"), at 949-50.  She has experience in Applied Behavior Analysis and is a certified safety care trainer.  *Id*. at 950-52, 964.  Although she has completed the 1,500 hours of supervision required to be certified as a BCBA, she had not yet passed the examination as of the date of the hearing, having failed it during her first try that summer.  *Id*. at 952-53; *Pray* at 1115-16.

64.     Titcomb has observed I.J. at MMCC nine times and has reviewed her Portland file and MMCC's documentation, including its FBA, positive behavior support plan, and behavioral

data concerning I.J. *Id*. at 955-56. She is familiar with I.J.'s IEP and transition plan. *Id*. at 956. She has observed some of I.J.'s behavioral issues, including some that were very challenging. *Id*. at 961-62. She noticed that I.J. typically is compliant and is easily redirected when noncompliant. *Id*. at 962. She observed that I.J. was often distracted by the sound of staff talking in the hallway at MMCC and had very little social interaction with other students there, aside from at morning meeting. *Id*. at 968, 970.

65.    Titcomb was confident that LMMS could implement I.J.'s transition plan, behavior plan, and IEP. *Id*. at 958-61, 973-85. The LMMS FLS program had seven other students, four educational technicians, and one other teacher, Bruno. *Id*. at 995. Most of the students were verbal, but two were not. *Id*. at 996. Two had verbal skills similar to those of I.J. *Id*. Titcomb, who testified that she had only one student on her caseload besides I.J., was to implement I.J.'s educational program at LMMS, providing some direct instruction herself as well as overseeing direct instruction by Bruno and two educational technicians. *Id*. at 959-60, 998. Titcomb testified that she would use discrete trial training for academic tasks. *Id*. at 960. She noted that, although MMCC was a very restrictive setting, LMMS could provide I.J. with reverse mainstreaming so that she could benefit from interacting with typically developing peers and engage in some of the social interaction that she craves. *Id*. at 984.

66.    Mrs. J. testified that, as of the date of the hearing, Portland had not informed her of I.J.'s schedule at LMMS. *Mrs. J.* at 600. However, Dr. Chemelski noted that "[a]ny transition plan is a dynamic process and so at any point during the transition there may be modifications . . . even in the best thought out plans[.]" *Chemelski* at 783. Some aspects of I.J.'s schedule would depend on her team's informed clinical judgment, such as when and to what degree she participated in outings and in the "buffet" of mainstreaming options available to her, including participation in

34

classes such as physical education and music, a "lunch club" with one or two mainstream students, and "Moore time" enrichment programs offered at LMMS. *Id*. at 825-26, 830-31; *Titcomb* at 981, 992-94. I.J.'s clinical team also would make decisions about her participation in outings such as field trips and grocery store trips. *Chemelski* at 830-31; *Pray* at 1125.

67.     In addition to Titcomb, a number of people from Portland have visited MMCC, including Hammond, Bruno, Pray, and I.J.'s occupational therapist, physical therapist, and speech therapist. *Feltis* at 149-50, 162, 194. Drs. Pawletko and Chemelski have also observed I.J. at MMCC. *Pawletko* at 665; *Chemelski* at 762, 804-05.

68.     Portland had taken most of the key steps in the transition plan to ready LMMS for I.J. *Titcomb* at 973-84. Dr. Chemelski testified that the small room intended to be used for I.J.'s instruction still needed "a little more work in terms of a clearly-identified primary work space with easily accessible storage of materials[,]" as well as a rug and a white sound machine. *Chemelski* at 832-33. He testified that the FLS room was not yet ready for I.J. in that the team needed to further define what she would be doing in that room and create more of an individual work space for her "if she was going to be doing more academic-related activities within that space[.]" *Id*. at 834. He noted that, in his experience, such a modification had always been doable at LMMS when recommended by a child's clinical team. *Id*.

69.     Dr. Chemelski testified that, in his opinion, if the transition plan were carried out and there were no major surprises, I.J. would be able to "access her IEP as written" at LMMS. *Id*. at 788. He anticipated a short-lived spike in I.J.'s interfering behaviors upon her transition to LMMS, following which he expected that her behaviors would return to her MMCC baseline. *Id*. He stated that he believed I.J.'s behaviors could be managed at LMMS, that MMCC staff, which he described as "highly skilled," had done "an incredibly admirable job" of fulfilling their purpose

of analyzing the function of I.J.'s behaviors and providing a roadmap for the team in Portland, and that, in his opinion, it was "time to hand off to a less restrictive setting" that provided other benefits that MMCC could not replicate, such as role modeling by neurotypically developing students. *Id.* at 794-99.  He testified that the spike in some of I.J.'s behaviors at about the time of the hearing did not alter his overall view that I.J. was ready to transition to LMMS, although "if she were coming back tomorrow, I would be concerned." *Id*. at 835-37.  He added: "[T]hat one alone [behavior] spike is not enough to change my testimony today." *Id*. at 836.

70.     Dr. Chemelski noted that he had recommended frontloading his services upon I.J.'s transition to LMMS, so that initially he would be observing her for an hour weekly onsite, receiving data on her on a weekly basis, and meeting with her team for an hour weekly. *Id*. at 823-24.  He anticipated that, following a successful transition, these could be reduced to biweekly time frames. *Id.*  He testified that Vincent's belief that I.J. required another year at MMCC was arbitrary. *Id*. at 786.

71.     Dr. Pawletko testified that she thought I.J.'s proposed classroom at LMMS could be a productive work space for her, although she recommended "dry runs of activities" to know for certain. *Pawletko* at 685-86.  She recommended that, to make the small classroom ready for I.J.'s use, Portland should address the bareness of the walls, provide directed lighting for activities, muffle the sound of the blower if possible, and install a rug. *Id*. at 686-87.  She otherwise found it to be a fairly quiet space at the end of a hallway, with easy access to and from the building. *Id*. She testified that she thought the FLS room was fine for I.J., other than defining space within it for I.J. given the openness of the room. *Id*. at 687-88.  She testified that she had no reason to doubt that things not yet in place for I.J.'s return would be in place for her. *Id*. at 690.  She noted that there were benefits to I.J. in attending a community-based school with access to local resources

and typically developing children, including opportunities to generalize her skills and have contact with a typically developing population for language modeling. *Id*. at 690-93. She testified that she had no reason to believe that the type of program I.J. required could not be provided in a public school setting or that her behaviors could not be addressed at LMMS. *Id*. at 674, 693.

72.     Titcomb testified that the blower in I.J.'s classroom might function as a white noise machine for her but that, if it proved a distraction, the team would work to correct it. *Titcomb* at 967-68. She stated that Portland either had – or could easily obtain – items called for in the transition plan, such as an iPad, a rug, and a backpack. *Id*. at 973-75. She testified that, in accordance with the transition plan, I.J.'s team had identified "duck-in" spaces along her travel routes in the event of dysregulation or disrobing. *Id*. at 977-79.

73.     In early October 2014, about a week prior to giving testimony at hearing, Ferguson again observed the proposed small classroom for I.J. at LMMS. *Ferguson* at 281-82. The far end of the room had a desk for I.J. and a beanbag chair, a divider behind I.J.'s desk, and a cabinet near her desk, and the other end of the room contained a larger desk for use by a teacher and a small table for use in meeting with mainstream students. *Id*. at 282. Ferguson deemed the room acoustically inappropriate for I.J. given reverberation caused by its cinderblock walls, a continuing lack of carpeting in the room as of the time she viewed it, and a vent that made a sound like an exhaust fan, which she felt would affect I.J.'s ability to focus. *Id*. at 283, 446.

74.     Pray testified that Portland would not complete I.J.'s move to LMMS until all aspects of her transition plan and program were in place, noting that certain aspects had been on hold because of the stay-put. *Pray* at 1131. Both Drs. Pawletko and Chemelski testified that they expected that the implementation of I.J.'s IEP at LMMS would provide her with meaningful

educational benefit, although she would have transitional difficulties. *Pawletko* at 681; *Chemelski* at 788.

75.    At MMCC, I.J. was in a classroom called the Pond, consisting of four students between the ages of 10 and 13. *Feltis* at 189. I.J. was the oldest, and her classmates were ages 10 and 11. *Id*. at 190. I.J. normally would have been in MMCC's secondary program but it was full, and MMCC staff thought that it was a good fit for her to stay where she was. *Id*. at 219, 223. Dr. Chemelski thought that MMCC had a nice set-up for I.J. and she seemed happy there. *Chemelski* at 807-08. I.J. participated in weekly grocery shopping trips with her 1:1 educational technician, sometimes accompanied by one peer, swimming every other week with nine peers, and occasional field trips with groups ranging from three to nine peers. *Feltis* at 133-36. Going out into the community, which is a goal in I.J.'s IEP, is important for her progress, although the prospect of outings, particularly with larger groups, causes her anxiety. *Id*. at 133-34.

76.    When I.J. first arrived at MMCC in the summer of 2013, she was at level C in Reading A to Z. *Feltis* at 145. As of the time of the hearing, she was at levels D and E. Record, Vol. V at 1072. Her reading fluency objective was to read D-E level guided texts at 90 percent accuracy by June 2014. *Id*. As of that time, she was reading level D with 91 percent accuracy. *Id*. Her second short-term objective was to read at levels F-G at 90 percent accuracy by September 2014. *Id*. By August 2014, she was reading at level D with 88 percent accuracy and level E at 82 percent accuracy. *Id*. She did not meet her reading comprehension objectives, initially making progress and then regressing during the summer of 2014. *Id*. This was a pattern for her both in Portland and at MMCC. *Id*. at 1063-80; *Moran* at 927. In the Edmark program, however, she was exceeding expectations, and the same was true in spelling. Record, Vol. V at 1073. She made some uneven progress in math goals. *Id*. at 1074-76. She met six of eight behavior goals set by

MMCC.  *Vincent* at 419-20.  While she did not meet her goals for verbal perseveration or hyperarousal, her instances of those behaviors had gone down as of the time of hearing.  *Id.* at 420-21.  She experienced a spike in instances of disrobing at about the time of the hearing, some of which Vincent attributed to the presence of visitors from Portland staff observing I.J. at MMCC. *Id.* at 376-77.

77.     Vincent described I.J.'s profile as one of the most complex at MMCC.  *Vincent* at 352.  She was the only student at MMCC exhibiting hyperarousal and disrobing level two (self-stimulatory sexual behavior once clothing was removed).  *Id.* at 342-43.  Vincent requested 40 hours per quarter of BCBA services for her, twice the average of about 20 hours of such services quarterly at MMCC.  *Id.* at 352-53.  He ascribed the need for this level of services to "the level of [I.J.'s] needs and for the safety of the staff[,]" noting that at times someone with more experience needed to help a staff member gain I.J.'s compliance and get her back on track.  *Id.* at 354.  Vincent, however, agreed that the behavioral interventions developed at MMCC could be implemented by knowledgeable staff elsewhere.  *Id.* at 396.

78.     The due process hearing in this case was held during six days spanning the period from September 30, 2014, to November 7, 2014.  *See* State of Maine Special Education Due Process Hearing [Decision] ("Hearing Decision"), [*J.*] *v. Portland Sch. Dep't,* Case No. 15.003H (Me. Dep't of Educ. Dec. 13, 2014), at 1.[2]  The hearing officer's decision issued on December 13, 2014.  *Id.*  Pursuant to the IDEA's stay-put provision, I.J. remained at MMCC through the conclusion of seventh grade and was an eighth-grade student there as of the date of the filing of Portland's brief, April 13, 2016.  Portland's Brief at 3.

---

[2] For ease of reference, I refer to the consecutively numbered pages of the Hearing Decision rather than the Record pages where it is found, Record, Vol. XXI, at 4791-4835.

### III.  Proposed Conclusions of Law

### A.  Adequacy of Remedy for Fifth-Grade Denial of a FAPE

1.      The hearing officer concluded that I.J. was deprived of a FAPE during her fifth-

grade year at Portland's BEACH program, explaining:

> The legal question of whether [I.J.'s] lack of progress on her academic goals, and
> the lack of keyboarding instruction and O&M services amount to a deprivation of
> FAPE is [] difficult to analyze for many reasons.  [I.J.'s] progress and abilities were
> difficult to assess, her needs were very complex, and her progress was generally
> slow, with some regression.

> Although the Parents point to the failure of the District to complete ABLLS testing,
> this does not seem to be significant in terms of [I.J.'s] lack of progress.  Lori Coffin
> discussed how standardized testing was not the best measure for [I.J.], and MMCC
> staff also did not complete ABLLS testing while [I.J.] was there, noting at an IEP
> team meeting that although ABLLS was a good tool, there might be other
> assessments that were better suited to [I.J.].  Ms. Coffin's report said the methods
> used by Ms. Moran were a better way to assess [I.J.] than standardized tests.

> The Parents have alleged that during [I.J.'s] fifth grade year in the BEACH
> program, she did not receive key services required by her IEP, did not make
> adequate academic progress, and regressed behaviorally, as well as in some
> academic areas.  During the first month of fifth grade, [Mrs. J.] corresponded with
> Ms. Moran, who acknowledged that [I.J.'s] programming had "slowed down" since
> the previous February, and [I.J.] had very little growth since then.  At the time of
> this correspondence, [I.J.] had shown very little growth for six months.  This limited
> growth continued through the school year.  Although [I.J.] made progress in most
> SLP and PT goals, I conclude that she did not make reasonable progress
> academically or overall.  Well before the March 28, 2013 IEP team meeting, it was
> apparent that [she] was not meeting many of her academic goals.  There were no
> graded IEPs in evidence from this period, and the types of data provided were often
> different and therefore difficult to compare from one year to the next.  Ms. Moran's
> narrative reports were helpful, but she was not able to show much progress on
> several important academic areas, particularly in reading and some areas of math.

> The Parents noted that Ms. Moran tried to help [I.J.] make progress by changing
> programs throughout the year when she had not seen results, but this did not result
> in [I.J.] meeting her IEP goals.  Thus, while the District correctly quoted the
> holdings in *Roland M* and *Lessard* as viewing IEP decisions in terms of what was
> reasonable "at the time the IEP was promulgated," this does not mean that the
> District can take no action when there are indications early in the school year that
> an IEP is not providing the intended results.  It also does not take into account
> services that were not delivered to [I.J.].  The Parents actively advocated for [I.J.],

> and expressed their concerns throughout the school year about the lack of certain services, behavioral issues, and the lack of educational progress.  Although Ms. Moran was a dedicated teacher and a very credible witness, she seemed frustrated that the administration was not as concerned about [I.J.'s] needs [as] she was. While Ms. Moran tried her best to educate [I.J.], when she was not making adequate progress, it was the District's responsibility to convene an IEP team meeting to evaluate [her] program and consider other options.  This did not happen until [I.J.'s] annual review in March of 2013.

Hearing Decision at 34-36 (citations and footnote omitted).

2.      The hearing officer noted that, at the March 2013 IEP team meeting, Portland agreed to have Coffin evaluate I.J. for reading issues and Dr. Kimball try an experimental design to see if the setting impacted I.J.'s behaviors and ability to learn, ultimately agreeing to send I.J. to MMCC for the summer when Portland was unable to address her behaviors and lack of academic progress.  *Id*. at 36-37.  She observed that, while this was an appropriate action to take, it should not have taken an entire year for Portland to act.  *Id*. at 37.

3.      She added that Portland failed to provide certain services, particularly O&M and keyboarding instruction, despite evidence of the importance of such instruction to I.J.  *Id*. at 37.  She concluded that "[t]hese omissions, along with the lack of academic progress, add up to a failure to provide [I.J.] with a FAPE during fifth grade."  *Id*. (footnote omitted).

4.      The hearing officer stated that, although it was "very difficult to craft a remedy for [I.J.] for the District's failure to provide her with reasonable educational benefit during fifth grade[,]" compensatory educational services were one possible remedy.  *Id*. at 43.  She concluded:

> It is clear that [I.J.] should receive eight hours of O&M services for the services she did not receive that school year.  More complicated, however, is how to figure out what amount of keyboarding instruction to order, as there was no amount specified in the IEP and no evidence of how much she missed, or how to compensate for the lack of academic progress, particularly in language arts and reading.
>
> The Parents assert that an appropriate compensatory award should take the form of placement of [I.J.] for an additional year at MMCC.  I do not believe it would be appropriate to order that she continue to be educated in the more restrictive MMCC

setting, and this may violate [her] rights under the IDEA to be educated in the least restrictive environment.

To remedy the lack of keyboarding instruction, the District shall provide [I.J.] with a desktop computer deemed appropriate for her by Barbara Ferguson, and ten hours of keyboarding instruction.

[I.J.] shall also be provided, at the District's expense, with 20 hours of compensatory instruction in language arts/reading.

*Id*. at 43-44.

5.     The hearing officer ordered that these services be provided by qualified individuals by August 31, 2015, unless the Parents chose to receive them at a later date.  *Id*. at 44.  The Parents could choose to arrange those services on their own, in which case they were to cooperate with Portland as to its preferred method for payment.  *Id*. at 45.

6.      The Parents ask the court to "enhance this paltry compensatory award, as it could not possibly return I.J. to the position she would have occupied had Portland provided her with a proper education in the first place."  Parents' Brief at 16.  They contend that the total award of 38 hours of services (the equivalent of approximately one week of school instruction) could not place I.J. in the same position she would have occupied had she received appropriate assessment, behavioral intervention, and academic and keyboarding instruction throughout the entirety of her fifth-grade year.  *See id*. at 20.  They argue that the award provided no remedy to compensate for deficiencies in her math program, addressed only a small portion of the deficit in her reading instruction, failed entirely to address the serious behavioral deficiencies in her fifth grade programming, and provided a quantity of keyboarding and O&M instruction that did not take into account how far behind her skills fell due to the lack of timely and appropriate services.  *See id*.

7.     They assert that the hearing officer erred in denying their requested remedy of an additional year at MMCC on the ground that it would have interfered with I.J.'s right to be

42

educated in the least restrictive environment, arguing that, for purposes of compensatory relief, parents need not satisfy the "least restrictive environment" requirement of the IDEA. *Id*. at 21.

8.      They ask that this court order a remedy of further educational instruction at MMCC, or such remedy as it feels is appropriate, to compensate I.J. for Portland's failure to provide her with a FAPE during fifth grade and place her in the position she would have occupied but for that omission. *See id*. at 20-21.

9.      Portland counters that, because the Parents have not challenged the hearing officer's finding of a FAPE violation, the problems warranting a remedy are limited to those that she identified. *See* Portland's Brief at 16.  It asserts that she carefully tailored her remedy to the deficits that she concluded deprived I.J. of a FAPE, namely, (i) lack of progress on her academic goals, (ii) lack of keyboarding instruction, and (iii) failure to deliver the eight hours of O&M services called for in I.J.'s IEP.  *See id*. at 17-18.    It disputes that she found that any of the following contributed to the lack of a FAPE: (i) the lack of ABLLS testing, (ii) staffing difficulties early in the fifth-grade school year that were quickly remedied, or (iii) the level of I.J.'s progress in her math or behavioral goals.  *See id*. at 18.  It adds that she pointed to positive aspects of I.J.'s fifth-grade year, including opportunities to interact with typically developing peers, and recognized that, even in the best of circumstances, I.J.'s progress was slow and uneven, with some regression.  *See id*. at 19-21.  Finally, it asserts that, in any event, the Parents failed to carry their burden to identify specific educational deficits resulting from the loss of a FAPE or specific remedies needed to address them.  *See id*. at 21-22.

10.     The Parents rejoin that, as a matter of law, the court is not bound by the hearing officer's ruling on remedy but, rather, must make an independent decision based on the evidence as a whole.  *See* Plaintiffs' Reply Memorandum of Law ("Parents' Reply") (ECF No. 33) at 1-2.

They argue that, even assuming the correctness of Portland's position that the problems warranting a remedy are limited to those identified by the hearing officer, Portland downplays her finding that I.J. failed to "make reasonable progress *academically or overall*" and did not make much progress in "*several important academic areas*, particularly in reading and some areas of math." *Id*. at 3 (quoting Hearing Decision at 35) (emphasis added by Parents).

11.  The Parents are correct that the court is not bound by the hearing officer's ruling on remedy, *see, e.g., Dobrowolski*, 976 F.2d at 52, and that, even if it is bound by her subsidiary findings on the bases for the denial of a FAPE, Portland construes her findings too narrowly.

12.  First, and most critically, the hearing officer found that I.J. failed to "make reasonable progress academically or overall[,]" expressly acknowledging that I.J. did not make much progress in "some areas of math." Hearing Decision at 35. This reflected her factual findings that that, while I.J. "made good progress in counting and number sequencing," she "did not make progress on her new coin identification program, days of the week, and calendar skills[,]" and "[t]he Parents compared [her] progress on a number of math goals, which showed very limited progress since 2010." *Id*. at 9.

13.  Second, the hearing officer found that, despite the Parents' expressions of concern throughout I.J.'s fifth-grade year regarding lack of certain services, behavioral issues, and lack of educational progress, Portland did not convene an IEP team to address those issues until March 2013. *See id*. at 36. She noted that, while, at that time, Portland appropriately commissioned a reading evaluation by Coffin and a study by Dr. Kimball to determine if I.J.'s setting impacted her behaviors and lack of academic progress, ultimately agreeing to send I.J. to MMCC for the summer when it was "unable to address" those issues, it "should have acted before an entire year had passed." *Id*. at 36-37.

44

14.     This, in turn, reflected the hearing officer's factual findings that (i) Mrs. J. expressed concern to Moran in September 2012 that I.J. was putting her hands in her pants at school, and Moran agreed this needed to be addressed, with I.J. increasingly exhibiting attention-seeking behaviors, (ii) data kept by Portland between September 2012 and February 2013 showed that I.J.'s hyperarousal levels had increased and were very high on a daily basis, (iii) Moran testified that I.J.'s interfering behaviors were significantly increasing toward the end of the fifth grade, which was when she began disrobing, and (iv) the IEP team determined at its June 4, 2013, meeting to place I.J. in an ESY program at MMCC that summer because of her "behaviors and attention issues." *Id*. at 7-8, 10, 12.

15.     Third, and finally, the hearing officer provided only one rationale for declining the Parents' requested compensatory award of an additional year at MMCC: that she did not believe it would be appropriate to order that I.J. continue to be educated in the more restrictive MMCC setting, which might violate her right under the IDEA to be educated in the least restrictive environment. *See id*. at 44.  Yet, that fear was unfounded: she had the power to order such a placement without running afoul of the IDEA. *See, e.g., Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 15-16 (1993) ("[O]nce a court holds that the public placement violated IDEA, it is authorized to grant such relief as the court determines is appropriate.  Under this provision, equitable considerations are relevant in fashioning relief, and the court enjoys broad discretion in so doing.") (citations and internal quotation marks omitted); *Draper v. Atlanta Indep. Sch. Sys.,* 518 F.3d 1275, 1286 (11th Cir. 2008) ("We do not read the Act as requiring compensatory awards of prospective education to be inferior to awards of reimbursement. . . . Although it ordinarily has a structural preference for special education in public schools, the Act does not foreclose a compensatory award of placement in a private school.").

16.     The hearing officer's award was insufficient to remedy the denial of a FAPE in I.J.'s fifth-grade year.  It provided an inadequate level of language/reading instruction to remedy her regression in language skills and no compensatory math or behavioral services whatsoever.

17.     Nonetheless, as Portland suggests, *see* Portland's Brief at 21, the Parents as the parties seeking relief bear the burden of persuasion that the relief is required.  *See, e.g., Schaffer*, 546 U.S. at 51.  The Parents sought the remedy of an additional year of education at MMCC, *see* Hearing Decision at 44; however, this remedy effectively was provided when I.J. remained in MMCC pursuant to the IDEA's stay-put provision, which "requires [a] school district to bear the financial cost of [a] student's current educational placement during the pendency of any proceedings[,]" *Mr. C. & Mrs. C. ex rel. K.C. v. Maine Sch. Admin. Dist. No. 6*, 538 F. Supp.2d 298, 303 (D. Me. 2008).

18.     "[F]ederal courts . . . have found IDEA claims to be mooted where the operation of stay-put secures for students the same relief that they request as a remedy in litigation."  *Derek H. ex rel. Ritako H. v. Department of Educ., State of Haw.*, Civ. No. 14-00143 ACK-KSC, 2015 WL 9478231, at *3 (D. Haw. Dec. 29, 2015).  While, in this case, the stay-put placement does not moot the remedy sought in this litigation, it has mooted the remedy sought at the due process hearing. The Parents do not explain why I.J.'s continuing placement at MMCC did not adequately remedy the fifth-grade denial of a FAPE.  In their initial brief, they simply sought a remedy of an unspecified amount of further educational instruction at MMCC, or such remedy as the court felt was appropriate, to place I.J. in the position she would have occupied but for the yearlong denial of a FAPE.  *See* Parents' Brief at 21.  In their reply brief, they argued that, in view of the fact that I.J.'s fifth-grade IEP called for two hours per day of educational instruction, and the school year totals 175 days, I.J. should be awarded 350 hours of academic instruction in math and literacy

rather than the 20 hours of academic instruction actually awarded. *See* Parents' Reply at 6. They noted, however, that such an award still would not factor in the need to address I.J.'s behaviors, as a result of which continued placement at MMCC was critical to returning her to the position she would have occupied but for the denial of a FAPE. *See id*. Yet, this again begs the question of how further placement at MMCC, in circumstances in which I.J. has remained at MMCC through eighth grade, is required to remedy the fifth-grade denial of a FAPE.

19.     In sum, while the hearing officer's remedy for the denial of a FAPE during I.J.'s fifth-grade year was inadequate, the Parents have failed to demonstrate a need for additional relief beyond that afforded as a result of I.J.'s stay-put placement at MMCC. Therefore, I recommend that the court deny the Parents' request for relief on this basis.

### B.  Proposed Seventh Grade Placement at LMMS

20.     The parties have no dispute over the content of the IEP proposed for I.J. for the 2014-15 school year. *See* Hearing Decision at 37. Rather, their disputes are over whether the proposed placement at LMMS was appropriate and whether Portland predetermined that placement in violation of the IDEA. *See id*. at 37-38; Parents' Brief at 21-33; Portland's Brief at 22-35.

### 1.  Adequacy of Process (Alleged Predetermination)

21.     "Predetermination amounts to a procedural violation of the IDEA." *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006) (citation and internal quotation marks omitted). "It can cause substantive harm, and therefore deprive a child of a FAPE, where parents are effectively deprived of meaningful participation in the IEP process." *Id.* (citation and internal quotation marks omitted). "However, predetermination is not synonymous with preparation." *Id.* "Federal law prohibits a completed IEP from being presented at the IEP Team

meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions." *Id*. (citations and internal quotation marks omitted). "[T]his participation must be more than mere form; it must be *meaningful*." *Id*. (citations and internal punctuation omitted) (emphasis in original).

22.     The hearing officer rejected the Parents' argument that Portland predetermined I.J.'s placement, finding that, "Although Ms. Pray initially assumed that [I.J.'s] placement at MMCC was just for the summer of 2013 and believed that [I.J.] could be educated in the FLS program at LMMS, other facts demonstrate that neither her position nor that of [Portland] was set in stone, and the Parents were not deprived of meaningful participation in determining [I.J.'s] placement." Hearing Decision at 38-39.  She deemed it "understandable" that each time Pray set a new deadline for I.J.'s transition, Mrs. J. felt that a decision had already been made to bring I.J. back to the Portland schools. *See id*. at 39.  However, she found that, regardless of Pray's reasons for setting the deadlines or belief that LMMS could provide I.J. with a FAPE, the IEP team, including Mrs. J., "had a great deal of input on the issue of [I.J.'s] placement." *Id*.  She observed, "There were many IEP team meetings where the team discussed evaluations, where the team agreed to [Mrs. J.'s] requests for certain evaluations, and where [Mrs. J.'s] views were heard and affected the outcome." *Id*.  She concluded, "While it initially may have appeared, from Ms. Pray's conduct, that [I.J.'s] placement was predetermined, the evidence does not bear this out." *Id*.

23.     The Parents disagree, asserting that Portland's own notices were replete with affirmations of its predetermined placement and arbitrary "transition" dates, even before the IEP team had any discussion of I.J.'s assessment results or whether she could benefit from such a

change in placement.  *See* Parents' Brief at 22-23.  They argue that this is all the more remarkable given Pray's admission that Portland was not ready to educate I.J. in the fall of 2013 and remained unprepared to do so even at the time of the hearing.  *See id.* at 23.  They contend that the only evidence cited by the hearing officer in support of her finding of no predetermination was Portland's eventual agreement to Mrs. J.'s requests for certain assessments; however, Portland refused to await the outcome of those assessments before determining that I.J. would be transferred to LMMS.  *See id.*

24.    The Parents add that the only reason I.J.'s placement was not changed on December 2, 2013, was their due process filing.  *See id.* at 25.  They assert that, although Portland avoided that hearing by agreeing to consider FBA results before determining placement, Pray subsequently emailed Mrs. J. and informed her that the next IEP team meeting would center on I.J.'s transfer to LMMS, ignoring not only the IDEA's procedures but also the parties' written agreement.  *See id.* They contend that their participation was not meaningful.  *See id.*

25.    Portland disagrees, asserting that Mrs. J. significantly impacted most decisions that were made, including the initial placement at MMCC (with which Pray agreed), the decision to undertake an FBA, decisions to put off placement changes during the 2013-14 school year, and the decision to address further transition planning in the spring of 2014, resulting in the transition plan of Drs. Chemelski and Pawletko.  *See* Portland's Brief at 34.  Portland states that it relied heavily both on the transition plan and on the views of Drs. Chemelski and Pawletko, two well-respected outside consultants, that I.J. could be successfully educated at LMMS.  *See id.* at 34-35. With respect to Pray's deadline-setting, Portland observes that (i) she explained at hearing that she set such deadlines as a matter of practice to spur others to complete activities on issues as to which there was no consensus, (ii) the original transition deadline that she set, December 2, 2013, was to

49

have been after completion of Dr. Pawletko's evaluation and MMCC's FBA, (iii) following the Parents' filing in November 2013 of their request for a due process hearing, Pray agreed to put off a placement decision until the IEP team received and reviewed the FBA and anything else necessary for the team decision, and, (iv) from that point forward, there were no deadlines. *See id*. at 33-34. Instead, the IEP team decided that a transition plan was needed before a decision could be made on placement, and that occurred. *See id*. at 34. Pray testified that if Drs. Chemelski and Pawletko had stated that they did not believe the transition should occur, she would not have gone forward with it. *See id*.

26. The evidence, as a whole, demonstrates that Portland did not predetermine I.J.'s placement. Pray reasonably understood that I.J. was to return to Portland after spending the summer of 2013 at MMCC: that had been the IEP team's determination. Notwithstanding that determination, the team agreed with Moran's recommendation that transition be delayed to permit Bruno, who had been newly hired, to prepare for I.J.'s arrival. The team used some vague language: that team members were to reconvene in five or six weeks to "discuss next steps." Record, Vol. VIII at 1684. Pray's interpretation that this meant next steps toward transition was no less reasonable than that of Mrs. J. that it meant reconsideration of placement at LMMS.

27. In the circumstances, it was understandable that Pray came to the October 2, 2013, IEP meeting equipped with three near-term transition date proposals. However, by the end of that meeting, it was clear that the Parents and Pray held strong clashing views. The team was not persuaded to keep I.J. at MMCC for the balance of sixth grade as Mrs. J. requested; however, Pray compromised to the extent that she set a transition date (December 2, 2013) that allowed for consideration of the results of evaluations the team agreed should be completed in November, including the MMCC FBA.

28.     It is true that, at the next IEP team meeting (November 19, 2013), Pray adopted a rigid stance that I.J. would return on December 2, 2013, notwithstanding the fact that the FBA had yet to be completed.  Yet, assuming that this constituted an offer of a predetermined placement, the Parents effectively remedied the violation, obviating the need for further remedy by the hearing officer or this court.  They immediately filed a due process hearing request, obtaining Portland's written agreement to consider I.J.'s placement with the benefit of the completed evaluations, including the FBA.  Unfortunately, Pray subsequently made comments, and issued a written meeting notice, indicating her continued intention to focus on transition rather than placement. However, the Parents again swiftly remedied that transgression at the first post-agreement IEP team meeting in January 2014.  From that point, the process unfolded in accordance with the parties' due process mediation agreement.  All IEP team members, including the Parents, were allowed a full and fair opportunity for input on the question of placement and, ultimately, transition.

29.     In the end, I.J.'s placement was not "forced on the parents[.]"  *Nack*, 454 F.3d at 610.  The Parents were neither "effectively deprived of meaningful participation in the IEP process" nor offered a "pre-selected" placement "regardless of [I.J.'s] demonstrated individual needs."  *Id.* (citations and internal quotation marks omitted).  To the contrary, based in large part on the Parents' strong and effective input, Portland (i) assembled a highly competent team, including Drs. Chemelski and Pawletko, to meet I.J.'s needs, (ii) altered, or was in the process of altering, classroom space for her, and (iii) developed a detailed transition plan customized to her needs.  Although the IEP team ultimately determined, contrary to the Parents' beliefs and wishes, that LMMS was a suitable placement for I.J., the offer was not the product of predetermination.

30.     For these reasons, I recommend that the court deny the Parents' request for relief predicated on the procedural violation of predetermination of I.J.'s placement.

## 2. Substantive Adequacy of Placement

31.     The hearing officer concluded that, for the 2014-15 school year, I.J.'s IEP could be implemented, and provide her with a FAPE, at LMMS.  *See* Hearing Decision at 39-42.  She determined that:

A.     Portland had assembled an excellent team for I.J., including Titcomb, a master's level special education teacher with considerable experience working with students with autism and other behavioral challenges, who had completed all requirements to become a BCBA except for passing the licensing examination, Ferguson, who would continue to be I.J.'s teacher concerning visual impairment, Hammond, who would consult on augmentative and communication devices, and two highly respected psychologists, Drs. Chemelski and Pawletko.  *See id*. at 39-40.  Unlike at MMCC, where all direct instruction was provided by educational technicians, a certified teacher would provide some of I.J.'s direct instruction at LMMS.  *See id*. at 40.

B.     The transition plan devised by Drs. Chemelski and Pawletko addressed I.J.'s expected difficulties transitioning to a new school.  *See id*.  Both testified that the transition could satisfactorily occur, and the placement would be appropriate.  *See id*.

C.     While Mrs. J. and MMCC staff preferred that I.J. remain at MMCC, I.J. had made progress on almost all of the behavioral goals that formed the basis for her attendance there in the first place, and the rest of the IEP team concluded that she could satisfactorily transition to the FLS day treatment program at LMMS under the approved IEP, behavioral plan, and transition plan

once all of the elements were in place. *See id*. at 40-41.  There was no evidence that the transition plan was inappropriate or inadequate. *See id*. at 41.

      D.      LMMS, a day treatment program in a public school at which I.J. would have the opportunity, when appropriate, to interact with typically developing peers, was a less restrictive placement than MMCC, where she would not have that opportunity. *See id*.  There was considerable evidence at hearing of how social I.J. was and how much she enjoyed spending time with her mainstream peers. *See id.*  She needed "a balance between healthy social interaction and concentrated learning time without distractions," which the LMMS program could provide. *See id.*  Even if MMCC were a superior program, Portland had essentially recreated the substantive elements of the MMCC program in a school in I.J.'s own town. *See id*. at 42.

      E.      Although the Parents had argued that LMMS was not ready to receive I.J., Portland had already assembled the necessary staff and almost every other element, apart from a few classroom items that could easily be obtained such as a rug and a white noise machine. *See id.*

      32.      The hearing officer ordered that I.J. transition to LMMS as soon as all elements were in place, in accordance with the transition plan approved by her IEP team. *See id*. at 42, 45.

      33.      The Parents identify three reasons why this was error: that (i) there was no evidence that Portland staff had the training or experience to handle a child with a disability profile as complex as that of I.J., a deficiency not remedied by the recruitment of offsite consultants Drs. Chemelski and Pawletko, who would not be available day-to-day or minute-to-minute, (ii) the FLS room and small classroom intended for I.J.'s use at LMMS did not meet her needs, and (iii) the hearing officer erred as a matter of law in relying on Portland witnesses' self-serving testimony regarding what the program might look like, rather than what it actually was. *See* Parents' Brief at 26-33. As Portland counters, *see* Portland's Brief at 22-32, none of these points is well-taken.

34.     With respect to staffing, the Parents assert that there was no evidence that the providers hired to operate I.J.'s program had the training and experience to instruct a student as complicated as she was, and that Titcomb had no experience working with a child of I.J.'s age or complex disability profile. *See* Parents' Brief at 26.

35.     They add that, although strong BCBA services were essential to I.J.'s programming, Portland provided no information at hearing about the credentials of its BCBA candidate, who was not called to testify, other than that she had had one year of experience as a BCBA. *See id*. They note that, by contrast, Dr. Chemelski repeatedly characterized Seth Vincent, I.J.'s BCBA at MMCC, as impressive and praised his behavioral work and that of other professionals at MMCC. *See id*.   They argue that there was no reason to expect that the ill-equipped and inexperienced team at LMMS would do any better than Portland had in controlling I.J.'s interfering behaviors in fifth grade. *See id*. at 26-27.

36.     Finally, they fault the hearing officer for overlooking the fact that two critical providers on the LMMS team, Drs. Pawletko and Chemelski, were outside consultants whose services would not be available day-to-day or minute-to-minute, as are those of Vincent and Dr. Cameron at MMCC. *See id*. at 27.   They assert that, given I.J.'s complexity, reliance on off-site consultants, combined with inexperienced team members "on the ground," was wholly insufficient. *Id*. at 28.

37.     As Portland points out, *see* Portland's Brief at 22, while the Parents question the experience and skill level of its providers, they do not contend that they lacked appropriate certification.  Titcomb was a certified special education teacher who was experienced in working with students with autism and other behavioral challenges.  While she had not passed her BCBA licensing examination, she did not need that credential to serve as I.J.'s teacher and case manager.

As the hearing officer suggested, *see* Hearing Decision at 39-40, her BCBA training was a decided plus in view of I.J.'s needs.  Moreover, whereas I.J. was instructed at MMCC solely by educational technicians, she was to be instructed at LMMS by an experienced special education teacher (Titcomb), in addition to Bruno, with whom Dr. Chemelski had been very impressed, and two educational technicians.  Titcomb planned to use the same reading and math programming methodologies for I.J. as had been used at MMCC.

38.     In addition, Portland had committed in I.J.'s IEP to provide her with 40 hours of BCBA services quarterly, as Vincent had recommended.  No one disputes that Vincent was a capable BCBA; however, the Parents offer no reason to believe that Mulcunry, whom Portland had hired to serve as I.J.'s BCBA, would have been incapable of managing her needs.  "Although the Supreme Court has recognized the importance of parental consultation, and participation in the IEP decision-making process, nothing in the Court's opinions suggest[s] that parents usurp the District's role in selecting its staff to carry out the IEP's provisions."  *Slama ex rel. Slama v. Independent Sch. Dist. No. 2580*, 259 F. Supp.2d 880, 885 (D. Minn. 2003).

39.     As Portland points out, *see* Portland's Brief at 27, the Parents' argument regarding Drs. Chemelski's and Pawletko's status as off-site consultants is selective: they did not raise such an argument as to Ferguson, the visual impairment teacher whom Portland had contracted to serve as an off-site consultant to I.J. for many years and who was to be part of her LMMS team.  In any event, their point is not well-taken.  Drs. Chemelski and Pawletko were not intended to serve as direct providers for I.J. but, rather, consultants to the staff, with whom they envisioned meeting most intensively during I.J.'s transition.  Each brought pertinent experience and expertise to the table: Dr. Pawletko had expertise in working with children on the autism spectrum who were blind or visually impaired, and Dr. Chemelski was a specialist in behavioral programming, in

transitioning children from more restrictive to less restrictive settings, and in building service delivery models through a coordinated team process.

40.     With respect to the LMMS facilities, the Parents state that Ferguson deemed the FLS room at LMMS unsuitable for I.J. because it was too large and distracting. *See* Parents' Brief at 28.  They note that it contained several large windows and a hammock and was used by several other students, most of whom were nonverbal, and at least three male educational technicians – a problem in that male instructors historically had served as a trigger for I.J. to disrobe and masturbate. *See id*. at 28-29.  They assert that, while Titcomb testified that I.J. could use the FLS room when it was unoccupied, that would be true for only about a half an hour a day, as a result of which I.J. would spend nearly six hours daily in her proposed classroom, a small, uninviting cinderblock room that formerly was a utility closet. *See id*. at 29.  They state that Ferguson found that room inappropriate for I.J. because its cinderblock walls and tile floor were terrible acoustically and lockers outside the door would be loud and distracting, and even Titcomb agreed it was not inviting for a child. *See id*.

41.     Yet, despite these criticisms, the preponderance of the evidence demonstrates that the facilities LMMS proposed to use for I.J. were appropriate.  While Ferguson criticized the acoustics of the instructional classroom, she, Dr. Pawletko, and Dr. Chemelski all agreed that a rug should be placed on the floor and that the sound of a blower should be muffled and/or a white noise machine provided.  Ferguson and Dr. Pawletko both identified a need to change the room's lighting and address its bare cinderblock walls.  With these minor modifications, Drs. Pawletko and Chemelski felt the instructional classroom would be an appropriate space for I.J.  Of note, while Ferguson deemed I.J.'s classroom at MMCC appropriate, she made suggestions to improve I.J.'s experience there as well; for example, that MMCC obtain a slant board and reading stand for

her.  As Portland points out, *see* Portland's Brief at 27, despite the Parents' criticism of the low-stimulation room in which I.J. would receive most of her educational services as an uninviting former utility closet, the LMMS service room was actually larger than the service room at MMCC.

42.    As concerns the FLS room, Ferguson noted that windows in that space would interfere with I.J.'s ability to focus on her work.  However, Dr. Chemelski testified that, to the extent that I.J. was going to attempt academic work in that space, the FLS room could be modified to create an individual workspace for her, a type of modification that in his experience had been doable at LMMS when recommended by a child's clinical team.

43.    As concerns the configuration of the rooms intended for I.J.'s use within the larger school, both Ferguson and Dr. Pawletko identified advantages.  Ferguson noted that the rooms were in close proximity to one another so that I.J. would not be subjected to multiple distractions of walking through long hallways, and Dr. Pawletko described the space as a fairly quiet one at the end of a hallway, with easy access to and from the building.  While Ferguson expressed concern that noise from passing students in the hallway could distract I.J., no students were passing by when she was present.  The Parents perceive a disadvantage: that, given the relative isolation of those rooms from the rest of LMMS, I.J. would be more restricted at LMMS than at MMCC, where she had access to all portions of the facility.  *See* Parents' Brief at 29-30.  They argue that, given the evidence of I.J.'s interfering behaviors, it was unlikely that she could make progress significant enough to be able to access the loud LMMS hallways filled with many students.  *See id.*

44.    The record is replete with evidence that I.J. was a highly social child who enjoyed interacting with others, including mainstream peers.  Portland understood this, and intended, as is reflected in the transition plan, to involve her in activities within the larger school and in community outings to the extent deemed appropriate by her clinical team.  Dr. Chemelski stated

that he expected I.J.'s behaviors to spike in the short term upon her transition but then return to her MMCC baseline level.  This would have boded well for her ability to access the school and the community more broadly.  In addition, Portland had designed I.J.'s own space to permit interaction with mainstream peers by providing a table and chairs in her instructional classroom for the purpose of such visits.

45.     The Parents finally challenge the hearing officer's conclusion that LMMS was a proper placement for I.J. on the basis that she erred as a matter of law in relying on Portland witnesses' self-serving "retrospective testimony" concerning what the placement might become, rather than what it was.  *See* Parents' Brief at 30-31 (citing *Reyes ex rel. R.P. v. New York City Dep't of Educ.*, 760 F.3d 211, 220 (2d Cir. 2014); *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 174 (2d Cir. 2012); *B.R. ex rel. K.O. v. New York City Dep't of Educ.*, 910 F. Supp.2d 670, 676-77 (S.D.N.Y. 2012)).[3]

46.     The Parents assert that the evidence demonstrates that Portland was not ready to receive I.J. as of the time of the due process filing in July 2014 or even as of the start of the school year in September 2014, contending that Portland failed to establish (i) what I.J.'s schedule would be at LMMS, (ii) how many hours per day she would be restricted to the small classroom, (iii) how or when she might use the larger FLS room, considering its distractions, (iv) where and with whom she would eat meals and snacks, (v) whether and how she would participate in out-of-school community outings, which were critical to the success of her programming, (vi) who would accompany her on those community outings, (vii) how she would go on recess, given that LMMS

---

[3] "'Retrospective testimony' is a term of art originated in [the United States Court of Appeals for the Second] Circuit in 2012 to refer to testimony about additional services that *would have* been provided had the parent accepted the school district's proposed placement."  *Reyes*, 760 F.3d at 220 n.6.

does not have a recess, (viii) where she would go when there was a student assembly, (ix) where she would receive OT, PT, and SLP services, given that the therapy room at LMMS is in their view unsuitable in that it is identical to the FLS room, and (x) how long she would be confined to her "pod" before she could access other parts of the school or even the hallway. *See id.* at 31-32.

47.     As Portland points out, *see* Portland's Brief at 29, the cases cited by the Parents stand for a different principle: that it is error to rely on testimony about services that could have been in an IEP but were not, *see Reyes*, 760 F.3d at 220 (holding that hearing officer erred in relying on testimony that IEP could be modified to extend paraprofessional's services; noting that retrospective testimony cannot be used "to materially alter a deficient written IEP by establishing that the student would have received services beyond those listed in the IEP") (citation and internal quotation marks omitted); *R.E.,* 694 F.3d at 174  ("[W]e conclude that the use of retrospective testimony about what would have happened if a student had accepted the Department's proposed placement must be limited to testimony regarding the services described in the student's [IEP]."); *B.R.*, 910 F. Supp.2d at 677 ("[T]he Court evaluates whether, at the time B.R. was actually considering the proposed placement, the school could offer occupational therapy in line with the IEP.").

48.     Here, the IEP is not in dispute, and Portland had accomplished most of the steps in the transition plan.  There was testimony that Portland needed to obtain some items such as a rug and a white sound machine and make some alterations such as muffling the sound of a blower and creating an individual workspace within the FLS room for I.J.  However, these were punch-list items to ready the space for I.J. in accordance with the transition plan approved by the IEP team, not services or items that should have been, but were not, included in her IEP.  Moreover, the

hearing officer directed that I.J. not be transitioned until all elements were in place in accordance with her transition plan.  *See* Hearing Decision at 42, 45.

49.     In any event, the Parents seemingly complain about a lack of evidence, rather than reliance on retrospective evidence; for example, that Portland failed to establish I.J.'s schedule, the number of hours during she would use the FLS room *versus* her small classroom, or the timing and manner in which she would access mainstream opportunities.  *See* Parents' Brief at 31-32. Yet, the transition plan addressed such matters, providing, for example, that I.J. would initially follow the schedule that she had at MMCC and eat snack and lunch in her instructional classroom and/or the FLS classroom and, as she settled in, access appropriately matched instructional peers and peer groups and eat in the OT room with "a small lunch bunch."  Record, Vol. V at 1122.

50.     Beyond this, Drs. Chemelski and Pawletko, respected and experienced outside consultants, both testified that LMMS was an appropriate placement for I.J. and that the time had come to transition her to a less restrictive setting, in which she could interact with mainstream peers.  While Vincent disagreed that I.J. was ready to transition to LMMS, he acknowledged that the behavioral interventions developed at MMCC could be implemented by knowledgeable staff elsewhere.

51.     In sum, the Parents' points are not well-taken.  The preponderance of the evidence demonstrates that LMMS was an appropriate placement for I.J. for seventh grade.  Accordingly, I recommend that the court deny the Parents' request for relief on this basis.

### IV.  Conclusion

For the foregoing reasons, I recommend that the plaintiff's request for relief be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 12th day of October, 2016.


/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge